ACCEPTED
13-14-00700-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
5/7/2015 4:48:57 PM
DORIAN RAMIREZ
CLERK

CAUSE NO. 13-14-00700-CV
CONSOLIDATED WITH
CAUSE NO. 13-15-00119-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
5/7/2015 4:48:57 PM
DORIAN E. RAMIREZ
Clerk

IN THE COURT OF APPEALS
FOR THE THIRTEENTH JUDICIAL DISTRICT
SITTING AT CORPUS CHRISTI - EDINBURG, TEXAS

---

HARLINGEN MEDICAL CENTER,
LIMITED PARTNERSHIP                                    APPELLANT

VS.

ROSA ANDRADE, AS NEXT FRIEND OF
MARY HELEN ANDRADE, A MINOR CHILD, ET AL          APPELLEES

---

**APPELLANT'S BRIEF**

---

ON APPEAL FROM CAUSE NO. 2014-DCL-1353-G
IN THE 404TH JUDICIAL DISTRICT COUNTY OF
CAMERON COUNTY, TEXAS

---

Scott Clark
Roger W. Hughes
Will Hughes
ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, TX 78551-1429

**ORAL ARGUMENT
IS REQUESTED**

Attorneys for Appellant

## IDENTITY OF PARTIES AND COUNSEL

### I. Appellant

| Appellant | Counsel |
|---|---|
| Harlingen Medical Center, Limited Partnership | Mr. Scott T. Clark<br>sclark@adamsgraham.com<br>Mr. Roger W. Hughes<br>rhughes@adamsgraham.com<br>ADAMS & GRAHAM, L.L.P.<br>P. O. Drawer 1429<br>Harlingen, TX 78551-1429<br>Phone: (956) 428-7495<br>Fax: (956) 428-2954 |

### II. Appellees:

| Appellees | Counsel |
|---|---|
| Rosa Andrade, as next friend of Mary Helen Andrade, a Minor Child, et al. | Mr. F. Leighton Durham, III<br>ldurham@texasappeals.com<br>**KELLY, DURHAM & PITTARD, L.L.P.**<br>P.O. Box 224626<br>Dallas, Texas 75222<br><br>Ms. Laura E. Gutierrez Tamez<br>ltamez@herreralaw.com<br>**THE HERRERA LAW FIRM, INC.**<br>111 Soledad Street, Suite 1900<br>San Antonio, TX 78205-2240 |

# TABLE OF CONTENTS

Page:

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

NOTE REGARDING CITATIONS TO THE RECORD . . . . . . . . . . . . . . . . . viii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . x

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     I.     Procedural background and nature of the case . . . . . . . . . . . . . . . . . . 1

     II.    Ralph Cross's report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     III.   Dr. C. Warren Adams's report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     IV.   Dr. Daniel DeBehnke's report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     V.    Gerald "Craig" Felty's report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     I.     Legal standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     II.    The reports are insufficient on causation because they fail
           to explain how meeting the standard of care to accomplish
           a transfer would have resulted in a successful transfer. . . . . . . . . . . 11

III.  Caselaw demonstrates the deficient nature of the causation
      opinions expressed in the reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   Causation cannot be supplied by appellees' non-physician
      experts, Ralph Cross and Craig Felty. . . . . . . . . . . . . . . . . . . . . . . 19

V.    The hospital cannot be blamed for Dr. Lopez's decision
      not to perform surgery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.   Because appellees already had a thirty-day extension, this case
      should be remanded for dismissal. . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES**

Page:

Cases:

*American Transitional Care Ctrs. of Tex., Inc. v. Palacios*,
46 S.W.3d 873 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Austin Heart, P.A. v. Webb*, 228 S.W.3d 276
(Tex, App.–Austin 2007, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13-15

*Baptist Mem'l Hosp. Sys. v. Sampson*,
969 S.W.2d 945 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bowie Mem'l Hosp. v.* Wright, 79 S.W.3d 48 (Tex. 2002) . . . . . . 10, 12, 14-16, 22

*Christus Spohn Health Sys., Corp. v. Trammell*, No. 13-09-19-CV,
2009 Tex. App. LEXIS 6329
(Tex. App.–Corpus Christi 2009, no pet.) . . . . . . . . . . . . . . . . . . . 10, 13, 14

*Clark v. HCA, Inc.*, 210 S.W.3d 1
(Tex. App.–El Paso 2005, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Collini v. Pustejovsky*, 280 S.W.3d 456
(Tex. App.–Fort Worth 2009, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Costello v. Christus Santa Rosa Health Care*, 141 S.W.3d 245
(Tex. App.–San Antonio 2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . 19

*Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675
(Tex. App.–Dallas 2000, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Estorque v. Schafer*, 302 S.W.3d 19
(Tex. App.–Fort Worth 2009, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fung v. Fischer*, 365 S.W.3d 507
(Tex, App.–Austin 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13-15

*HealthSouth of Houston, Inc. v. Parks*, 329 S.W.3d 885
(Tex. App.–Beaumont 2010, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hutchison v. Montemayor*, 144 S.W.3d 614
(Tex. App.–San Antonio 2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*In re Covenant Health Sys.*, 223 S.W.3d 423
(Tex. App.–Amarillo 2006, orig. proc.) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jones v. King*, 255 S.W.3d 156
(Tex. App.–San Antonio 2008, no pet.) . . . . . . . . . . . . . . . . . . . . . 10, 12, 18

*Leland v. Brandal*, 257 S.W.3d 204 (Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lenger v. Physician's Gen. Hosp.*,
455 S.W.2d 703 (Tex. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rio Grande Reg'l Hosp. v. Ayala*, 2012 Tex. App. LEXIS 7175
(Tex. App.–Corpus Christi August 24, 2012, pet. denied) . . . . . . . . . . . . . 19

*Schrapps v. Pham*, 2012 Tex. App. LEXIS 7781
(Tex. App.–Beaumont May 3, 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . 18, 19

*Tenet Hospitals, Ltd. v. Love*, 347 S.W.3d 743
(Tex. App.–El Paso 2011, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Tenet Hosps., Ltd. v. Barnes*, 329 S.W.3d 537
(Tex. App.–El Paso 2011, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tenet Hosps., Ltd. v. De la Riva*, 351 S.W.3d 398
(Tex. App.–El Paso 2011, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Women's Clinic of S. Tex. v. Alonzo*, No. 13-10-00159-CV,
2011 Tex. App. LEXIS 2177
(Tex. App.–Corpus Christi March 24, 2011, pet. denied) . . . . . . . . . . . . . 23


State Rules:
TEX. R. APP. P. 39.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

State Statutes:
TEX. CIV. PRAC. & REM. CODE ANN. §74.351 . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. CIV. PRAC. & REM. CODE ANN. §74.351(a) . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. CIV. PRAC. & REM. CODE ANN. §74.351(c) . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. CIV. PRAC. & REM. CODE ANN. §74.351(r)(5)(C) . . . . . . . . . . . . . . . . . . . . 19

TEX. CIV. PRAC. & REM. CODE ANN. §74.351(r)(6) . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. CIV. PRAC. & REM. CODE ANN. §74.403(a) . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. OCC. CODE ANN. §301.002(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**NOTE REGARDING CITATIONS TO THE RECORD**

This is a consolidated appeal. The Clerk's Record from appellate cause number 13-14-700-CV, which was filed by the District Clerk on December 12, 2014, is identified by appellant as "I C.R.." The Clerk's Record from appellate cause number 13-15-119-CV, which was filed by the District Clerk on March 24, 2015, is identified by appellant as "II C.R.."

The Reporter's Record for the hearing held October 30, 2014 from appellate cause number 13-14-700-CV is identified as "I R.R.." The Reporter's Record for the hearing held February 17, 2015 from appellate cause number 13-15-119-CV is identified as "II R.R.."

**STATEMENT OF THE CASE**

This is an expert report appeal in a health care liability claim. Appellees asserted medical negligence wrongful death claims against appellant Harlingen Medical Center (HMC) and Drs. David Yardley, Nataraj Desai, Shereef Hilmy, and Ruben Lopez. I C.R. 6-23. HMC filed a Motion to Dismiss for Insufficient Expert Reports, and appellees filed a response. I C.R. 45, 128. The trial court granted HMC's motion and allowed appellees a thirty day extension with regard to the experts' qualifications to render an opinion concerning the standard of care applicable to HMC, and otherwise denied HMC's motion. I C.R. 300. HMC timely filed a Notice of Appeal. I C.R. 304. Appellees' obtained an additional report and HMC filed a Second Motion to Dismiss. II C.R. 246. The trial court denied HMC's Second Motion to Dismiss, and HMC timely filed another Notice of Appeal. II C.R. 377, 378. HMC filed an unopposed motion to consolidate the two appeals, and that motion was granted.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant believes oral argument would be beneficial to the court and would permit the parties to address questions the panel may have regarding the issues presented by this case, and the decisional process would be significantly aided by oral argument. TEX. R. APP. P. 39.1.

**ISSUES PRESENTED**

George Andrade presented at Harlingen Medical Center with a dissected aorta. Cardiovascular surgeon Dr. Ruben Lopez recommended that Andrade be transferred to Memorial Hermann Hospital in Houston, but Andrade was rejected by Memorial Hermann for financial reasons. HMC tried three other hospitals, but none would accept Andrade. Andrade died at HMC, and his family sued HMC for failing to provide a transfer or surgery at HMC. HMC challenges the expert reports presented by appellees and raises the following issues:

1) Whether the opinions expressed by appellees' physician experts about causation were impermissibly conclusory and speculative, because

    a) they concede Andrade lacked insurance or other financial resources and at least two hospitals had expressly rejected Andrade because he lacked financial resources;

x

b) they fail to identify an adequate facility or surgeon that would have accepted Andrade as a transfer patient, or to explain why any such facility or surgeon would have accepted him;

c) they fail to explain how Andrade could be physically transferred to another facility given his medical condition and lack of financial resources;

d) they fail to otherwise explain how, by meeting the standard of care, HMC would have been able to accomplish a transfer for Andrade.

2) Whether appellees' non-physician experts are disqualified from offering the required opinion on causation.

3) Whether appellees' expert reports sufficiently support a claim that HMC should have compelled Dr. Lopez or some other surgeon to operate on Andrade by stating the standard of care for such a claim, how that standard was breached, or how such a breach caused Andrade's death.

**STATEMENT OF FACTS**

## I.      Procedural background and nature of the case

Appellees filed wrongful death and survival claims against appellant HMC and Drs. David Yardley, Nataraj Desai, Shereef Hilmy, and Ruben Lopez, arising from the death of George Andrade.  I C.R. 6.  Andrade was diagnosed at HMC with an aortic dissection.  I. C.R. 48, 119.  Cardiothoracic surgeon Dr. Ruben Lopez declined to operate on Andrade and recommended a transfer to Memorial Hermann in Houston.  I C.R. 49, 119.  However, Memorial Hermann declined the transfer because Andrade could not meet its funding demands.  I C.R. 48, 91, 119.  HMC's staff tried to transfer Andrade to three other hospitals in San Antonio and Galveston, but could not find a hospital and surgeon that would accept Andrade.  I C.R. 50-51, 92, 119; II C.R. 360-61.  Andrade died at HMC.  I C.R. 120.

Appellees presented expert reports from Dr. C. Warren Adams, Dr. Daniel DeBehnke, and non-physician Ralph Cross.  I C.R. 47, 71, 117.  HMC filed a Motion to Dismiss, alleging that appellees' expert reports were insufficient.  I C.R. 103.  After an oral hearing, the trial court issued an Order that granted HMC's motion with regard to the qualifications of appellees' experts to render an opinion regarding the standard of care applicable to HMC, and granted a 30-day extension to serve a supplemental report from an expert qualified on the standard of care applicable to HMC.  I R.R. 76, I C.R. 300, Appx. 1.  The Order denied HMC's Motion to Dismiss in all other

respects.  I C.R. 300.

Appellees then obtain an additional report from Gerald "Craig" Felty, a registered nurse.  II C.R. 359.  HMC filed a Second Motion to Dismiss based on the insufficiency of appellees' expert reports.  II C.R. 246.  This motion was denied outright.  II C.R. 377, Appx. 2.

## II.    Ralph Cross's report

Ralph Cross's report identifies him as a health care administrator.  I C.R. 117, Appx. 3.  Mr. Cross's report states that George Andrade arrived at the emergency department of Harlingen Medical Center at 15:32 on December 18, 2011.  I C.R. 118. At 22:18 on the 18th, Dr. Yardley indicated Andrade had a dissected aorta.  I C.R. 119.  At 13:30 on December 19 Dr. Lopez[1] recommended that Andrade be transferred to Memorial Hermann Hospital in Houston.  I C.R. 119.  However, Memorial Hermann denied the transfer because Andrade did not have the necessary funds.  I C.R. 119.

On December 20 HMC again tried to transfer Andrade to Memorial Hermann, but the transfer was again declined.  I C.R. 119.  Then HMC contacted the University of Texas Medical Branch in Galveston, but that hospital said it did not have capacity to accept Andrade.  I C.R. 119.  HMC also tried to transfer Andrade to Methodist

---

[1] Ralph Cross's report incorrectly identifies Dr. Lopez as an "emergency physician."  As the reports of Dr. Adams and Dr. DeBehnke acknowledge, Dr. Lopez is a cardiovascular surgeon.  I C.R. 56, 99.

Hospital and University Hospital in San Antonio, but those attempts were also unsuccessful. I C.R. 119. Cross wrote in his report that no further attempts were made to transfer on December 21st. I C.R. 119. Mr. Andrade died at 6:00 am on December 22. I C.R. 120.

Cross opined that HMC and its agents violated the standard of care by failing to obtain Andrade's consent for transfer, failing to obtain complete medical charts and physician certifications[2], failing to follow hospital guidelines for transfer, failing to make every effort to seek other facilities, failing to have sufficient knowledge of the patient, failing to seek further orders and physician involvement for the transfer, and failing to follow the chain of command "when it became evident Memorial Hermann was demanding several thousand dollars to accept Mr. Andrade for treatment, and Dr. Desai was negligently failing to answer calls from Methodist Hospital." I C.R. 122.

Cross did not offer an explanation of how any of these alleged breaches of the standard of care prevented the four hospitals contacted from accepting Andrade for transfer and surgery, nor of how complying with the standard of care would have caused these or any other hospitals to accept him for a transfer. I C.R. 117-123.

## III. Dr. C. Warren Adams's report

---

[2] Appellees' counsel acknowledged at the first hearing that Dr. Lopez did sign a physician certification form, but counsel faulted him for not filling out the rest of the form. I RR. 41. None of the expert reports mentioned anything about whether Dr. Lopez had failed to fill out the entire form, or about any effect such failure may have had.

3

Dr. Adams states that he is board-certified in cardiovascular surgery, thoracic surgery, and general-trauma care. I C.R. 47, Appx. 4. His report explains that a Type 1 aortic dissection like that experienced by Andrade is a tear in the wall of the aorta. I C.R. 48. He says the standard of care is emergent surgical repair to prevent rupture and death. I C.R. 48. He says "[p]atients who receive surgical repair within 24-48 hours can result in a better outcome as this dissection can be repaired. Without surgical treatment within 72 hours, rupture of the aorta in a Type 1 dissection can cause immediate bleeding into the pericardium, mediastinum, or free rupture into the thoracic cavities." I C.R. 48.

Like Cross's report, Dr. Adams's report notes that a transfer to Houston was recommended, but Andrade was rejected for financial reasons. I C.R. 48. Dr. Lopez commented that "no one would accept him because he's unfunded." I C.R. 48. Dr. Adams's report also notes the repeated unsuccessful attempts to transfer Andrade to UTMB in Galveston and to Methodist Hospital in San Antonio. I C.R. 50, 51. Methodist Hospital told HMC there was "no accepting surgeon." I C.R. 51. Dr. Adams's opinions regarding breaches of the standard of care by HMC are similar to those of Ralph Cross - that HMC failed to obtain physician signatures for the transfer, failed to notify the physicians of the declined transfers, failed to coordinate physician-to-physician communication, and failed to contact supervisors about the inability to effectuate a transfer. I C.R. 61-62.

4

Appellees' counsel identified Dr. Adams at the oral hearings as their expert on causation. I R.R. 28, 66; II R.R. 12, 13. Regarding causation, Dr. Adams's report stated:

> [t]hose patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.
>
> Harlingen Medical Center and its staff's delay . . . in arranging for an emergent and proper transfer of Mr. Andrade to a tertiary center as ordered by physicians as outlined above and in a timely manner resulted in progression of the dissection, with the known complication of rupture and death. . . . [H]ad Harlingen Medical Center and its staff arranged for treatment at its hospital or an emergent transfer to a tertiary center in a timely manner, Mr. Andrade, based upon a reasonable medical probability, would have more likely than not survived. I C.R. 62.

## IV. Dr. Daniel DeBehnke's report

Dr. Daniel DeBehnke's report states he is board certified in emergency medicine and has worked as a medical director. I C.R. 71, Appx. 5. Like Cross and Dr. Adams, Dr. DeBehnke notes that Dr. Lopez recommended Andrade be transferred for surgical repair. I C.R. 90. Dr. DeBehnke also notes that Memorial Hermann rejected Andrade for financial reasons and Dr. Lopez commented that "no one would accept him because he's unfunded." I C.R. 91. Dr. DeBehnke also notes that UTMB in Galveston and Methodist Hospital in San Antonio also refused the transfer. I C.R. 92. A transfer was then attempted to University Hospital, but they declined Andrade because he was out of the county and had no insurance. I C.R. 92.

5

Dr. DeBehnke's opinions about breaches of the standard of care by HMC were like those of Ralph Cross and Dr. Adams - that HMC had failed to obtain a physician certification or facilitate a physician-to-physician call, failed to provide all medical records, failed to obtain advanced patient consent, failed to prioritize transfer needs, failed to invoke the chain of command and contact hospital administrators when obstacles to transfer were encountered, failed to communicate with the patient about alternatives and options, and failed to work on the transfer during overnight hours. I C.R. 97-98.

> Regarding causation, Dr. DeBehnke's report states:
>
> Mr. Andrade's ultimate aorta rupture and subsequent death would not have occurred had Harlingen Medical Center and its nursing case managers, house supervisors[,] and hospital administration not breached the standard of care by failing to provide surgical treatment by its medical staff within its advertised capabilities of the facility and surgeons on call and failure to implement and complete an (sic) two emergent transfer orders to provide the opportunity to (sic) surgical treatment at another facility in a timely manner. HMC and its employee's delays adversely affected Mr. Andrade and was (sic) a proximate cause of a downward clinical spiral in his condition to include lack of adequate hospital management resulting in his death. " I C.R. 101-102.

## V. Gerald "Craig" Felty's report.

Like appellees' other experts, Felty noted that Dr. Lopez had recommended Andrade be transferred to another facility for surgical repair of his aortic dissection. II C.R. 360, Appx. 6. Felty also notes the unsuccessful efforts by HMC to arrange a transfer to Memorial Hermann in Houston, UTMB in Galveston, Methodist Hospital

6

in San Antonio, and finally University Hospital. II C.R. 360-361. Felty also notes the reasons these hospitals gave for rejecting the transfer, *i.e.*, that Andrade was "unfunded," that they had "no surgeon available" or no capacity, and that Andrade had no insurance. II C.R. 360-361. Memorial Hermann quoted a charge of $67,064 for Andrade's family. II C.R. 366.

Felty's opinions regarding breaches of the standard of care echoed those of appellees' other experts. Felty said HMC breached the standard of care by failing to obtain a physician-to-physician call, failing to obtain a physician certification, failing to obtain appropriate data to communicate to the receiving hospital, failing to work on the transfer during overnight hours, failing to invoke the chain of command, failing to keep the physician up to date, and failing to obtain advanced consent for a transfer. II C.R. 367.

Although Felty is not a physician and therefore disqualified by the statute[3] from offering an opinion on causation, he nevertheless attempts to offer a comment on causation at the end of his report, stating "[i]f the nurses had complied with the standard of care, in reasonable probability, Andrade would have been placed and would have received the surgery he needed." II C.R. 367. He did not explain how any additional efforts by the nurses would have resulted in Andrade being "placed"

---

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. §74.403(a) (Vernon 2011) (a person may qualify as an expert witness on the issue of the causal relationship only if the person is a physician).

7

and receiving successful surgery.

## SUMMARY OF THE ARGUMENT

Appellees claim that Andrade needed to be transferred to a hospital with adequate facilities and a surgeon available to provide the surgery he needed. To prove causation, they must identify such a hospital with such a surgeon, and explain how compliance by HMC with the standard of care for transfers would have gotten Andrade into such a hospital. But nowhere do appellees' experts identify any hospital that would have accepted Andrade as a transfer patient, nor do they identify a surgeon that could have operated on him at such a transfer facility, nor do they explain how Andrade would be transported from HMC to a transfer facility, given his medical needs and lack of funding. The reports repeatedly suggest Andrade would have survived if he had been accepted as a transfer patient and received surgery, but they skip over the essential step of explaining what hospital and surgeon were going to accept him and how he was going to get there. Their reports require the reviewing court to infer and speculate that a successful transfer would have been accomplished if HMC had met the standard of care in their efforts to transfer him. The legal standards for expert reports do not permit such speculation and inferences, but rather require the reports to explain how the alleged breaches of the standard of care caused the injuries alleged and to link the experts' opinions to the facts of the case.

Appellees briefly complain that HMC should have somehow seen to it that Dr.

Lopez or some other surgeon performed the surgery at HMC, but they do not contend or demonstrate that Dr. Lopez was under the control of HMC or was anything other than an independent contractor as physicians in Texas generally are. Nor do appellees demonstrate that Dr. Lopez or any other locally available surgeon had the requisite skill to repair a Type 1 aortic dissection.

Appellees already received the one thirty-day extension permitted by the statute to cure deficiencies in their reports. Therefore, they are not entitled to another extension, and dismissal with prejudice is appropriate.

## ARGUMENT

### I. Legal standards

A claimant in a health care liability claim must supply an expert report that addresses the applicable standards of care, the manner in which the health care provider failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. §§74.351(a), 74.351(r)(6) (Vernon Supp. 2014). The causal connection in a medical malpractice case must be made beyond the point of conjecture and must show more than a "possibility." *Fung v. Fischer*, 365 S.W.3d 507, 530 (Tex, App.–Austin 2012, no pet.); *citing Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex. 1970). Liability in a medical malpractice suit cannot turn on speculation or conjecture. *Lenger*, 455 S.W.2d at 706; *Hutchison v. Montemayor*, 144 S.W.3d 614,

9

618 (Tex. App.–San Antonio 2004, no pet.).

Even the "fair summary" required for a chapter 74 expert report must contain sufficiently specific information to demonstrate causation beyond mere conjecture. *Hutchison*, 144 S.W.3d at 618. Nor may causation be inferred. *Christus Spohn tHealth Sys., Corp. v. Trammell*, No. 13-09-19-CV, 2009 Tex. App. LEXIS 6329 at *7 (Tex. App.–Corpus Christi 2009, no pet.) (memo. op.). The expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Jones v. King*, 255 S.W.3d 156, 159 (Tex. App.–San Antonio 2008, no pet.). The report must explain how the alleged breach of the standard of care caused the injuries alleged. *Bowie*, 79 S.W.3d at 53; *Jones*, 255 S.W.3d at 159. A court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Fung*, 365 S.W.3d at 530; *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex, App.–Austin 2007, no pet.). Instead, the report must contain the required information within its four corners. *Bowie Mem'l Hosp.*, 79 S.W.3d at 53.

An expert report is insufficient when it contains only a series of repetitious, conclusory statements regarding causation. *Collini v. Pustejovsky*, 280 S.W.3d 456, 467 (Tex. App.–Fort Worth 2009, no pet.); *Jones*, 255 S.W.3d at 159. An opinion based on one assumption or conclusion built upon another is not sufficient. *Trammell*, 2009 Tex. App. LEXIS 6329 at *6.

10

The only information relevant to the court's inquiry is the information within the actual expert reports. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## II. The reports are insufficient on causation because they fail to explain how meeting the standard of care to accomplish a transfer would have resulted in a successful transfer.

The expert reports in this case are insufficient on the element of causation. The reports say that more should have been done to accomplish a transfer, and that, if a transfer had been accomplished, Andrade would have survived. None of the reports say *how* more efforts to accomplish a transfer would have resulted in a successful transfer. Specifically, none of the reports identify a hospital that would have accepted Andrade, nor do they explain how or why any hospital would have accepted Andrade if more or better efforts had been made to accomplish the transfer.

All of the reports acknowledge Andrade lacked financial resources and this was an obstacle to the transfer. None of the reports explain how Andrade's lack of financial resources could have been overcome or how any facility could have been persuaded to accept him as a patient. Furthermore, locating another hospital would not, by itself be enough - Andrade would still need a way to get to the accepting hospital[4], and would need a willing and capable surgeon at the accepting hospital to

---

[4] Dr. Adams's report notes that Andrade was given intravenous blood pressure medication and Vicodin for back pain, and describes Andrade as "critically ill." I C.R. 50. Dr. DeBehnke's report says Andrade's aortic dissection required "emergent repair" and needed an "emergent transfer." I C.R. 90, 98. None of the reports address whether Andrade would require a helicopter or long-distance ambulance for the transfer, nor how such expensive transport was

11

perform the surgery at that hospital. None of the expert reports address these issues, either.

The expert reports must explain the basis of their statements and link their conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Jones*, 255 S.W.3d at 159. Appellees' reports fail to do this. Appellees' case depends on an adequate hospital and a qualified surgeon being willing to accept Andrade as a patient despite his lack of financial resources. They do not show such a hospital and surgeon exist, and they do not show that any of the four hospitals contacted, or any other hospital, would have accepted Andrade if HMC had met the standard of care. They imply that if better transfer efforts were made an accepting facility would have been found, but they do not explain the basis for this opinion nor link it to any facts. Without explaining how an accepting hospital would have been found for the transfer, and without identifying an accepting surgeon or means of transportation, the expert reports are conclusory and speculative. They leave an analytical gap between their contention that the hospital and its agents were negligent regarding the transfer and the experts' contention that surgery at an accepting hospital would have saved Andrade's life. *See Tenet Hosps., Ltd. v. Barnes*, 329 S.W.3d 537, 543 (Tex. App.–El Paso 2011, no pet.) (expert report may not leave an analytical gap between breach of the standard of care and the ultimate harm); *citing Clark v. HCA, Inc.*, 210 S.W.3d 1, 11 (Tex. App.–El

to be arranged given Andrade's lack of financial resources.

12

Paso 2005, no pet.) (same). A reviewing court may not fill in the missing links between better efforts at a transfer and successful surgery at another hospital, nor may the court infer causation that is not explained in the reports. *Fung*, 365 S.W.3d at 530; *Webb*, 228 S.W.3d at 279; *Trammell*, 2009 Tex. App. LEXIS at *7.

The arguments of appellees' counsel in the trial court underscored the causation problems with their experts' reports. Appellees' counsel stated their position on causation was "[h]ad he been transferred and had medical treatment, then he would not have died." II R.R. 17. Like their experts, the attorneys could not explain how or to where a successful transfer was to be accomplished. The trial court inquired about these issues, and counsel denied they had to show how a transfer would have been accomplished and tried to shift attention to the next step in their argument, *i.e.* that if a transfer had somehow been accomplished, it would have saved him:

> THE COURT: Will you have to have, as the defense claims, a place to have -- a hospital willing to take him, the decedent, and a doctor willing to operate on him?
>
> MS. TAMEZ: I -- I don't believe that we would need to reach that burden even at that stage. What I think we have to show is that he would have survived. It would have been more likely than not that had he had intervention or treatment, that he would have survived and -- and lived. I mean, that's what the whole causation story is about, that there has to be a link between the intervention and his salvageability, or would he have survived.
> II R.R. 18.

Andrade's causation argument starts from the assumption that Andrade was in a position to receive "the intervention," *i.e.*, the surgery. Andrade's expert reports say

13

there is a link between "the intervention" and Andrade's "salvageability," but they do not connect the dots between compliance with the standard of care and saving Andrade's life.  There is a missing gap between their opinions on breach of the standard of care (*i.e.*, better efforts should have been made to accomplish a transfer) and their opinion on causation (*i.e.*, surgery at a transfer hospital would have saved Andrade) that is not addressed by the reports.  *Compare Fung*, 365 S.W.3d at 530 and *Austin Heart*, 228 S.W.3d at 279 (court may not fill in gaps in a report); *Trammell* 2009 Tex. App. LEXIS 6329 at *7 (causation may not be inferred); and *Bowie*, 79 S.W.3d at 52-53 (all required information must be in the report itself; the expert must explain the basis of his statements and link his conclusions to facts).

Later, in the hearing, another attorney argued that the transfer efforts were unsuccessful because the prospective transferees were not informed that Andrade's case was an emergency:

> [W]ith the correct information, with the correct communication between doctor to doctor, and then those hospitals realizing that, oh, my gosh, now this is an emergency situation, not a funding situation, or not a situation where the patient has a non-emergency condition, in that situation, those hospitals, or a hospital somewhere in Texas who has the capability to treat that patient, would have taken Mr. Andrade.
> II R.R. 19.

There are multiple problems with this argument.  First, it is still conclusory and speculative to claim, without explanation or support, that if additional information had been provided then some unidentified hospital would have accepted Andrade in time

14

to save him. Second, none of the expert reports say the problem was a failure to communicate the emergent nature of Andrade's status, nor do they explain how better communication would have resulted in a hospital and surgeon accepting Andrade as a transfer patient. Furthermore, appellees' expert Craig Felty describes himself as "very well-versed in the emergency medical treatment and active labor act (EMTALA)" but tellingly does not claim that any facility or surgeon had any obligation under EMTALA to accept Andrade as a patient or that HMC violated any provision of EMTALA. II C.R. 359, 359-368. Appellees and their experts do not argue that any potential hospital, surgeon, or medical transport company had a legal obligation to accept Andrade as a patient.

The arguments of counsel cannot supply the information that is missing in the reports. All of the information required by the statute must be contained within the reports themselves. *Bowie Mem'l Hosp.*, 79 S.W.3d at 53. All of the reports leap from "HMC should have done better work on the transfer" to "a transfer would have saved his life," without connecting the dots in between. None of the reports cover the gap between meeting the alleged standard of care for transfers and achieving a successful transfer. *Compare Fung*, 365 S.W.3d at 530 and *Austin Heart*, 228 S.W.3d at 279 (court may not fill in gaps in a report). The reports impermissibly require the reviewing court to infer that a hospital would have accepted Andrade as a transfer patient if it had received better information about him, without explaining how or why

15

that would have occurred.

Appellees' written responses to the Motions to Dismiss were no less conclusory than their arguments at the oral hearings. Counsel argued that Dr. Adams's report stated "the failures of the case management team to provide for and arrange for an emergent transfer and proper transfer as ordered by physicians resulted in the progression of Andrade's dissection" and:

> [i]n his opinion, the negligence of the case management team contributed to cause Andrade's death because these acts and omissions resulted in a complete failure of treatment for three days, at the end of which his aorta ruptured and he died. Andrade's aorta would not have ruptured had Harlingen Medical Center and its case managers not breached the standard of care by failing to provide surgical treatment or completing Andrade's transfer to another facility. I C.R. 219-220.

Appellees made no further attempt to explain how a successful transfer would have been accomplished or otherwise link the experts' conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

### III. Caselaw demonstrates the deficient nature of the causation opinions expressed in the reports.

*Tenet Hospitals, Ltd. v. Love*, 347 S.W.3d 743 (Tex. App.–El Paso 2011, no pet.) presented a factual situation with some similarities to our case. In that case, the plaintiffs' expert stated that if the hospital "had a pulmonologist or critical care specialist on call and available to see and treat this patient or had transferred this patient before her condition worsened, Brenda Melendez would more likely than not be alive today." *Id.* at 755. However, the court held the report was insufficient on

16

causation because "this broad statement does not set out specifically the causal relationship between the hospital's conduct and Melendez's death." *Id.* The court faulted the expert report for failing to explain how the hospital should have made the consultations available or accomplished the transfer, and said the report "simply expressed an inference without stating the underlying facts upon which the inference was based." *Id.* In our case, appellees' experts infer that if HMC had done a better job working on the transfer, an accepting hospital and surgeon would have been found. But they state no underlying facts on which this inference can be based. *Id.*

In *Estorque v. Schafer*, 302 S.W.3d 19 (Tex. App.–Fort Worth 2009, no pet.) the expert report stated that the physicians should have obtained a urological or gynecological consultation, and their failure to do so caused the patient to lose kidney function and suffer pain. *Id.* at 28. The court of appeals held the report insufficient because the expert "does not explain the basis of his opinions as to causation; his report leaves gaps by not explaining how or why the physicians' failure to consult a urologist or gynecologist caused worsening or progression of [the patient's] listed conditions." *Id.* at 28-29. Without such an explanation, the court could not infer that failing to make the referral for a consultation was a substantial factor in causing the alleged conditions. *Id.* at 29. In our case, the expert reports criticize HMC's transfer efforts and say a transfer would have saved Andrade's life, but they do not say how or why better transfer efforts would have accomplished a transfer.

17

In *Jones v. King*, the report opined that the patient's meningitis was not detected for more than forty-eight hours, leading to pain and suffering for the patient. 255 S.W.3d at 159. The court of appeals held the report failed to explain how the delay in diagnosis caused pain and suffering, noting "while it may be facially appealing to infer additional pain and suffering resulted from the alleged delay in diagnosis, the trial court is not permitted to rely on such speculation in determining the adequacy of the report. *Id*. at 160. Similarly, although the expert opined that the continued administration of morphine caused the hypothalamus to "go to sleep" and resulted in diabetes insipidus, the report was inadequate because it did not explain how the continued morphine caused the hypothalamus to go to sleep, or how a "sleeping" hypothalamus caused diabetes insipidus. *Id*. at 160-61. In our case, plaintiffs' experts say Andrade needed a transfer and criticize HMC's efforts to accomplish the transfer, but they do not say how better efforts would have resulted in a successful transfer.

*Schrapps v. Pham*, 2012 Tex. App. LEXIS 7781 (Tex. App.–Beaumont May 3, 2012, no pet.) (memo. op.) demonstrates what a sufficient expert report in a transfer case looks like. In that case, a patient became ill after a surgery. *Id.* at *1. Dr. Schrapps admitted the patient to the hospital, but then transferred the patient to Dubuis, a long-term acute care facility. *Id.* at *2, 6. The patient had recurring problems and was eventually transferred to Methodist Hospital, where she died. *Id.* at *2. The plaintiff's expert faulted Dr. Schrapps for initially transferring the patient

18

to Dubuis rather than transferring the patient directly to Methodist Hospital, explaining that the patient needed imaging, care, and monitoring that could only be supplied at a facility like Methodist. *Id.* at \*5-6. The appellate court held the expert report was sufficient on the negligent transfer allegation. *Id.* at \*6-8. Unlike in our case, the expert in *Schrapps* identified a hospital that would accept the transfer. *Id.* at \*6-7. The crucial link in the chain of causation, *i.e.*, identifying an accepting transfer facility, was present in *Schrapps* but is missing in our case.

## IV. Causation cannot be supplied by appellees' non-physician experts, Ralph Cross and Craig Felty.

Only a physician may render an opinion regarding causation. *Rio Grande Reg'l Hosp. v. Ayala*, 2012 Tex. App. LEXIS 7175 at \*24 (Tex. App.–Corpus Christi August 24, 2012, pet. denied); *Tenet Hosps., Ltd. v. De la Riva*, 351 S.W.3d 398, 406 (Tex. App.–El Paso 2011, no pet.); TEX. CIV. PRAC. & REM. CODE ANN. §74.351(r)(5)(C) (Vernon Supp. 2014); *HealthSouth of Houston, Inc. v. Parks*, 329 S.W.3d 885, 889 (Tex. App.–Beaumont 2010, no pet.). The Texas Nursing Practice Act expressly prohibits nurses from rendering a medical diagnosis. TEX. OCC. CODE ANN. §301.002(2) (Vernon Supp. 2014). To give an opinion on the cause of someone's death necessarily demands the ability to make a medical diagnosis, which nurses cannot do. *Costello v. Christus Santa Rosa Health Care*, 141 S.W.3d 245, 248 (Tex. App.–San Antonio 2004, no pet.). Cross is a business executive and Felty is a nurse; neither is a physician. I C.R. 117-127; II C.R. 359-376. Therefore, neither

Cross nor Felty can provide the causation opinion required by the statute.

**V.  The hospital cannot be blamed for Dr. Lopez's decision not to perform surgery.**

Appellees suggest HMC was negligent for not seeing to it that surgery was performed on Andrade at HMC. I. C.R. 62, 98-102. Dr. DeBehnke states HMC is "required to provide definitive surgical care to a patient such as Mr. Andrade unless it is deemed beyond the capabilities of the organization and/or the staff" and HMC breached the standard of care by "failure to provide definitive emergent care, a provision for continuing care such as emergent surgical treatment." I C.R. 99, 101. He says Andrade would have survived had HMC "not breached the standard of care by failing to provide surgical treatment by its medical staff within its advertised capabilities of the facilities and surgeons on call." I C.R. 101. Similarly, Dr. Adams says Andrade's death was caused by HMC's "failure to provide and arrange for providing immediate surgery within the capabilities of the hospital and medical staff." I C.R. 62.

Both experts acknowledge that cardiovascular surgeon Dr. Ruben Lopez was consulted, and Dr. Lopez decided not to take Andrade into surgery himself but rather that Andrade should be transferred. I C.R. 49, 90. Although Dr. DeBehnke discusses statements on the HMC website about the general kinds of care it provides, each patient is different and presents his own set of complications and comorbidities. Neither expert addresses whether, in Dr. DeBehnke's words, this surgery on this

20

patient was "deemed beyond the capabilities of the organization and/or the staff." I C.R. 99. Dr. Lopez apparently deemed that it was. I. C.R. 49, 90. Because the experts do not show that HMC and its doctors were capable of providing the surgery Andrade needed, they do not show that the standard of care required HMC to provide surgery to Andrade.

Nor do they discuss how the standard of care could require the hospital to provide surgery, when physicians at private hospitals in Texas are independent contractors and not under the control of the hospital in the way an employee would be. *See Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675, 684 (Tex. App.–Dallas 2000, no pet.) (as a general rule, physicians are considered independent contractors with regard to the hospitals at which they enjoy staff privileges); *see also Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998) (a hospital is not ordinarily liable for the negligence of a physician who is an independent contractor). Appellees do not contend, in their expert reports or pleadings, that Dr. Lopez or any other surgeon was an employee of the hospital or anything other than an independent contractor. Appellees and their experts do not state what additional steps, if any, the standard of care obligated HMC to take to persuade Dr. Lopez to perform the surgery once he had decided transfer was the better option, nor do they explain how, if only HMC had taken such steps, Andrade's death would not have occurred. Surgery requires a willing surgeon. Given that, in Dr. Lopez's medical

judgment, Andrade should be transferred rather than taken into surgery at HMC, appellees' experts do not explain how HMC was nevertheless supposed to ensure Andrade received surgery at HMC.

Nor do appellees' experts demonstrate that the outcome would have been different had Dr. Lopez or someone else taken Andrade into surgery. The expert reports do not claim that Dr. Lopez's determination to transfer rather than operate was incorrect and this surgery was, in fact, within "the capabilities of the organization and/or the staff." Without demonstrating that Dr. Lopez or some other surgeon was capable of this surgery and would, in fact, have saved Andrade's life by performing surgery at HMC, the expert reports fail to explain how the alleged breach of the standard of care caused Andrade's death and fail to provide an adequate opinion on causation. *Bowie*, 79 S.W.3d at 159.

## VI. Because appellees already had a thirty-day extension, this case should be remanded for dismissal.

The Texas Supreme Court has held that section 74.351 permits one thirty-day extension to cure a deficient report. *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008). Section 74.351(c) of the Texas Civil Practice and Remedies Code says:

> (c) If an expert has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency.

> TEX. CIV. PRAC. & REM. CODE ANN. §74.351(c) (Vernon Supp. 2014).

22

Appellees have already had one thirty-day extension; they are not allowed another. I C.R. 300; *see Women's Clinic of S. Tex. v. Alonzo*, No. 13-10-00159-CV, 2011 Tex. App. LEXIS 2177 at *7-9 (Tex. App.–Corpus Christi March 24, 2011, pet. denied) (because one extension had already been allowed, another extension would not be granted; plaintiff was on notice of all potential deficiencies in the expert report and acted at her own risk in failing to remedy those alleged deficiencies); *see also In re Covenant Health Sys.*, 223 S.W.3d 423, 427 (Tex. App.–Amarillo 2006, orig. proc.) (after thirty-day extension has been granted, remedy for meritorious second motion to dismiss is dismissal with prejudice).  Therefore, the proper remedy is to remand with instructions to dismiss the claims against HMC with prejudice to refiling.

## CONCLUSION AND PRAYER

Appellees' experts discuss at length all of the ways they believe HMC should have done a better job trying to transfer Andrade, and they say if he had been transferred and surgery performed, then he would have survived.  But they do not say how or why doing a better job to search for a transfer would have achieved one.  They acknowledge four hospitals in different cities were approached, and they acknowledge the hospitals approached cited Andrade's lack of funding as a reason to deny the transfer.  The expert reports provide no solution to this funding problem.  Nor is any mention made as to how any transfer was to be effectuated.  While Andrade's predicament was tragic, appellees' experts do not demonstrate, beyond speculation

23

and conjecture, that it was HMC's fault.

WHEREFORE, Appellant Harlingen Medical Center prays that this Court issue an opinion holding that appellees' expert reports were insufficient as to causation and that appellees have already received the one thirty-day extension authorized by statute, that this case be remanded to the trial court with instructions to dismiss the claims against Harlingen Medical Center with prejudice to refiling, and for all other relief to which they are entitled.

Respectfully submitted,

**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas 78551-1429
(956) 428-7495
(956) 428-2954 (Fax)


By: /s/ *Scott T. Clark*
        SCOTT T. CLARK
        State Bar No. 00795896
        sclark@adamsgraham.com
        ROGER W. HUGHES
        State Bar No. 10229500
        rhughes@adamsgraham.com
        WILL HUGHES
        State Bar No. 10240100
        will@adamsgraham.com

Attorneys for Appellant/Defendant
HARLINGEN MEDICAL CENTER, LIMITED
PARTNERSHIP

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9(j)(3), the undersigned certifies this Appellant's Brief complies with the type-volume limitations of Tex. R. App. P. 9(j)(2)(B).

Exclusive of the exempted portions in Tex. R. App. P. 9(j)(1), Appellant's Brief contains __6,162__ words. Appellant's Brief has been prepared in proportionally spaced typeface using:

Software Name and Version: __WordPerfect X5 for Windows__

in (Typeface Name and Font Size): __New Times Roman 14 point__.

ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, TX 78551-1429t
956/428-7495; FAX: 956/428-2954
sclark@adamsgraham.com


By:    /s/    *Scott T. Clark*
       SCOTT T. CLARK
       State Bar No. 00795896

Attorney for Appellant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this 7th day of May, 2015, to the following counsel of record:

Attorneys for *Appellees* ROSA ANDRADE, ANF OF MARY HELEN ANDRADE, ET AL.:

F. Leighton Durham, III                                                    *Via e-service*
**KELLY, DURHAM & PITTARD, L.L.P.**
P.O. Box 224626
Dallas, Texas 75222

Ms. Laura E. Gutierrez Tamez                                    *Via e-service*
**THE HERRERA LAW FIRM, INC.**
111 Soledad Street, Suite 1900
San Antonio, TX 78205-2240


/s/    *Scott T. Clark*
SCOTT T. CLARK

**APPENDICES**

1.    Order on Defendants' Objections to Plaintiffs' Ch. 74 Expert Reports

2.    Order Denying Second Motion to Dismiss for Insufficient Expert Reports

3.    Expert report and resume of Ralph E. Cross

4.    Expert report of C. Warren Adams, MD, FACS, FACCP, PLLC

5.    Expert report of Dan DeBehnke, MD, MBA

6.    Expert report of Craig Felty, RN, BSN, MBA, CEN, EMP-P

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 1

## TO APPELLANT'S BRIEF

RECEIVED
2014-DCL-01353
11/5/2014 9:29:13 AM
Aurora De La Garza
Cameron County District Clerk
By Celso Amaro Deputy Clerk
3068298

**Cause No. 2014-DCL-1353-G**

| | | |
|---|---|---|
| ROSA ANDRADE, as Next Friend of | § | IN THE DISTRICT COURT |
| MARY HELEN ANDRADE, a minor | § | |
| child, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 404TH JUDICIAL DISTRICT |
| | § | |
| HARLINGEN MEDICAL CENTER, | § | |
| LIMITED PARTNERSHIP, et al., | § | |
| | § | |
| Defendants | § | CAMERON COUNTY, TEXAS |

## ORDER ON DEFENDANTS' OBJECTIONS TO
## THE PLAINTIFFS' CHAPTER 74 EXPERT REPORTS

On October 30, 2014, the Court considered the following motions:

- Defendants, David Yardley, M.D., and Shereef Hilmy, M.D.'s Objections to Ch. 74 Report of Carl Warren Adams, M.D.;

- Defendant, Nataraj Desai, M.D.'s Objections to Plaintiffs' Expert Reports of Ralph Cross, Carl Adams, M.D., and Daniel DeBehnke, M.D.;

- Defendant, Ruben M. Lopez, M.D.'s Objections to Plaintiffs' Expert Reports of Ralph Cross, Carl Adams, M.D., and Daniel DeBehnke, M.D.; and

- Defendant Harlingen Medical Center's ("HMC") Motion to dismiss for Insufficient Expert Reports.

(collectively referred to herein as "Motions to Dismiss"). After considering the Motions to Dismiss, Plaintiffs' Collective Response to Defendants' Objections to Plaintiffs' Chapter 74 Expert Reports, and the arguments of counsel, the Court rules as follows.

Defendants, David Yardley, M.D., and Shereef Hilmy, M.D.'s Objections to Ch. 74 Report of Carl Warren Adams, M.D. is DENIED;

299

Defendant, Nataraj Desai, M.D.'s Objections to Plaintiffs' Expert Reports of Ralph Cross, Carl Adams, M.D., and Daniel DeBehnke, M.D. is DENIED;

Defendant, Ruben M. Lopez, M.D.'s Objections to Plaintiffs' Expert Reports of Ralph Cross, Carl Adams, M.D., and Daniel DeBehnke, M.D. is DENIED; and

Defendant Harlingen Medical Center's Motion to Dismiss for Insufficient Expert Reports is GRANTED IN PART and DENIED IN PART. Specifically, HMC's objection to the qualifications of Plaintiffs' experts to render an opinion concerning the standard of care applicable to HMC is GRANTED. Plaintiffs are hereby granted a 30-day extension from the date of this order to serve on HMC a supplemental expert report from an expert qualified to render an opinion concerning the applicable standard of care for Harlingen Medical Center and whether that standard of care was breached. Otherwise, Harlingen Medical Center's Motion to Dismiss for Insufficient Expert Reports is DENIED.

Signed this 12 day of November 2014.

HON. ELIA C. LOPEZ
PRESIDING JUDGE

FILED 3:30 O'CLOCK ___ PM
AURORA DE LA GARZA, CLERK

NOV 1 2 2014

DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY
Celso Amaro

300

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 2

## TO APPELLANT'S BRIEF

Cause No. 2014-DCL-1353-G

| | | |
|---|---|---|
| ROSA ANDRADE, as Next Friend of | § | IN THE DISTRICT COURT |
| MARY HELEN ANDRADE, a minor | § | |
| child, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 404TH JUDICIAL DISTRICT |
| | § | |
| HARLINGEN MEDICAL CENTER, | § | |
| LIMITED PARTNERSHIP, et al., | § | |
| | § | |
| Defendants | § | CAMERON COUNTY, TEXAS |

## ORDER DENYING SECOND MOTION TO DISMISS
## FOR INSUFFICIENT EXPERT REPORTS

CAME ON TO BE HEARD, Defendant Harlingen Medical Center's Second Motion to Dismiss for Insufficient Expert Reports, and after reviewing Defendant's motion, Plaintiffs' Response and the arguments of counsel, the Court finds that Defendant's motion should be DENIED.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant Harlingen Medical Center's Second Motion to Dismiss for Insufficient Expert Reports is DENIED.

Signed this 17 day of February, 2015.

_____
JUDGE PRESIDING
FILED 10 o'clock A M
**ERIC GARZA** - DISTRICT CLERK

**FEB 19 2015**

DISTRICT COURT OF CAMERON COUNTY, TEXAS
By _____ Deputy #2

Order

Page 1
377

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 3

## TO APPELLANT'S BRIEF

# RALPH E. CROSS
6414 Brook Lake Drive
Dallas. Texas 75248
(972) 991-8404

June 30, 2014

Ms. Laura G. Tamez
The Herrera Law Firm
111 Soledad Street
Suite 1900
San Antonio, TX 78205

RE:     Rosa Andrade, as Next Friend of Mary Helen Andrade, a Minor Child; and Dolores Rincones, Acting by and through as Power of Attorney and in the Alternative as Next Friend of Ricardo Andrade, surviving Father of George Andrade, Deceased; Sergio Andrade, as Representative of the estate of George Andrade, Deceased, and on behalf of the Heirs of the Estate and on behalf of All Those entitled to recover under the Texas Wrongful Death Act for the death of George Andrade, Deceased.

Dear Ms. Tamez:

Thank you for asking me to review the Andrade matter. My qualifications to do so are as follows:

I am Board Certified in Hospital, and Healthcare Administration, and a Fellow of the American College of Healthcare Executives.

My 45 year career in Healthcare Administration includes senior executive management experience in a variety of roles. Since 1970 I have served as Chief Executive Officer of a 354 bed acute care hospital and healthcare corporation, Chief Executive Officer of a 225 bed acute care hospital, chief operating officer of a five unit multi-hospital system, and chief operating officer of a 659 physician member medical service organization.

Qualifications Regarding Standard of Care

In addition, I have extensive experience providing strategic and tactical consultation services to multi-unit hospital systems, integrated healthcare delivery systems, and physician organizations. I have experience and knowledge in the operations of case management departments involved in patient throughput to include emergency transfers. I have supervised and managed registered nurse case managers as an administrator of hospitals and managed healthcare organizations.

I have implemented and created policies and guidelines for emergent transfers of patients as a hospital administrator. I have revised and improved policies and procedures for emergent patient

117

transfers to ensure patient safety whether at a receiving or transferring hospital. I encountered on a routine basis nurses, hospital staff or case managers who had to seek assistance from hospital administration when necessary to institute the chain of command.

I have served as vice-chairman of the American Medical Association's Commission on Emergency Medical Services representing the American Hospital Association and Chairman of the Dallas/Fort Worth Hospital Council's Emergency Medical Services Committee. A copy of my curriculum vitae is attached as Attachment A to this report, which is incorporated by reference as if set forth verbatim.

Based on my background, education, and experience I have testified as an expert on matters pertaining to hospital operations, emergency department operations, organization and management, physician credentialing and medical staff organization, to include the function and responsibility of case management, organization and operations. I am offering a preliminary opinion on the issues pertinent to the case of Rosa Andrade, as Next Friend of Mary Helen Andrade, a Minor Child; and Dolores Rincones, Acting by and through as Power of Attorney and in the Alternative as Next Friend of Ricardo Andrade, surviving Father of George Andrade, Deceased; Sergio Andrade, as Representative of the estate of George Andrade, Deceased, and on behalf of the Heirs of the Estate and on behalf of All Those entitled to recover under the Texas Wrongful Death Act for the death of George Andrade, Deceased.

At your request I have reviewed several documents that are listed in Attachment B. Per your request, I have preliminarily summarized my opinions in this case, as regards the standard of care for hospital administration and the failure of Harlingen Medical Center to correctly discharge its obligations in the care of George Andrade. I have reviewed copies of the documentation of care of Mr. Andrade to include the medical records provided by Harlingen Medical Center (as detailed in Appendix B), the 2011 Joint Commission Hospital Accreditation Standards, the text Assessing Hospital Staff Competence, and "The Role of the Hospital Chief Executive Officer in Maximizing Patient Safety." by Arthur S. Shorr, FACHE

The following preliminary report and analysis is based on my review of these documents, and also upon my knowledge, experience and educational background.

On December 18, 2011, Mr. George Andrade arrived at Harlingen Medical Center's Emergency Department at 15:32. His complaints consisted of severe pain in the substernal area of the chest that radiated up to the neck and down to the kidney. Approximately two hours later, a CT angiogram was ordered to rule out an aortic dissection.

The following events and times appear to be important in evaluating the care Mr. Andrade received:

### December 18, 2011

| Time | Event |
|------|-------|
| 17:45 | Nataraj Desai, M.D. ordered Mr. Andrade to be admitted. |
| 18:27 | Consultation by David Yardley, M.D. ordered. |
| 21:46 | Dr. Yardley consults with Mr. Andrade. |

2

118

| | |
|---|---|
| 22:00 | Dr. Yardley's speaks with Radiologist. |
| 22:18 | Dr. Yardley's consultation indicated that Mr. Andrade had a dissected aorta which extended from the thoracic aorta to the iliac crests. He was to be off of anticoagulants. |

### December 19, 2011

| Time | Event |
|---|---|
| 00:00 | Dr. Yardley orders Mr. Andrade to be moved to the Critical Care Unit. |
| 00:50 | Mr. Andrade continues to complain of dull back pain. Blood pressure continues to fluctuate, with one reading as high as 198/134. |

It is of significant concern that none of the records provided revealed that no contact was initiated with a physician to discuss his condition, or begin the process for a transfer to a medical facility that could provide a level of care that Mr. Andrade required.

The records do not indicate that anyone, such as a cardiovascular surgeon, examined Mr. Andrade on December 19th. Regrettably, Ms. Maloy, RN, Harlingen Medical Center's Case Manager visited Mr. Andrade to discuss the discharge plan for him to leave the Medical Center to return home.

At 12:00 hours Mr. Andrade was taken to radiology. At 13:30 hours, Ruben M. Lopez, M.D. an emergency physician, recommended Mr. Andrade be transferred to Memorial Hermann Hospital in Houston even though he did not examine him. There is no evidence that a physician at Harlingen Medical Center contacted a physician at Memorial Hermann Hospital to discuss the need for Mr. Andrade's transfer. Due to Mr. Andrade or his family not having the necessary funds, Memorial Hermann declined to accept him for the vitally necessary surgery for an ascending aortic dissection. Transfer was no longer attempted after 6 p.m. by any nurse, hospital employee or case manager at Harlingen Medical Center.

On December 20, 2011, Memorial Hermann Hospital again declined to accept transfer of Mr. Andrade. At 13:25 the University of Texas Medical Branch in Galveston was contacted regarding accepting Mr. Andrade for care. They declined due to no capacity. At the request of Methodist Hospital in San Antonio, Dr. Desai was finally contacted after six attempts at 14:45 hours. University Hospital was recommended by Methodist Hospital, who also declined to accept transfer of Mr. Andrade without, again, documentation of a physician to physician call. Case management did not seek other resources or facilities to emergently transfer Mr. Andrade, and there is no evidence that they requested assistance from the Medical Center's Chief Nursing Officer, Chief of the Medical Staff or Chief Executive Officer.

Dr. Desai wrote in his progress notes that cardiothoracic surgery will work on transferring Mr. Andrade. At 14:00, it is noted that Mr. Andrade continues to wait patiently for transfer. The same two hospitals declining Mr. Andrade the day before were the only facilities contacted by case managers, or Mary Torres, RN. No further attempts were made to transfer on December 21st by anyone at Harlingen Medical Center.

3

119

Regrettably, Mr. Andrade died at 0600 hours on December 22, 2011 after enduring progressing pain, extreme temperature change and difficulty breathing through the evening without receiving care from a physician responsible for his care.

## Standard of Care

### Harlingen Medical Center

Harlingen Medical Center has informed the public that its executive team is committed to affording patients excellent service and high-quality care in every visit. To realize this commitment, HMC partners with highly experienced and highly skilled physicians, nurses, staff and volunteers. With each and every patient, HMC collectively endeavors to provide comprehensive, quality healthcare in a convenient, compassionate and cost effective manner.

Harlingen Medical Center contends that is known for creating unparalleled experiences for its patients from the moment they walk through its doors: a compassionate team of professionals, committed to affording you excellence in the service and care patients need to get and stay well.

Regarding its expertise in providing care for cardiovascular patients such as George Andrade, Harlingen Medical Center has informed the public of the following:

"Harlingen Medical Center is home to a number of highly skilled and experienced private practice cardiologists and cardiovascular surgeons, who can help create a path to health and wellness like no oth.er hospital in the Rio Grande Valley.

The Cardiovascular Care Program at Harlingen Medical Center is paving the way for successful treatment of patients across South Texas. We specialize in the diagnosis and treatment of cardiovascular disease, and our top-ranked cardiac team provides minimally invasive testing and treatment, as well as advanced cardiac and vascular interventions, such as angioplasty, stenting, cardiac ablation, and open heart surgery.

By specializing in one of the nation's deadliest diseases, we afford patients then benefit of highly skilled cardiologists, advanced technology, and services that meet individual needs."

The Standards promulgated by the Joint Commission are nationally accepted minimum community standards governing the administrative behavior of hospitals, and their employees and agents, and are applicable to hospitals in Texas. The Center for Medicare Services (CMS), the federal oversight agency that monitors and oversees all hospitals in the United States that accept federal reimbursement, recognizes the Joint Commission standards as minimum national standards by which all hospitals must comply. In addition, the State of Texas recognizes the Joint Commission standards as applicable to hospitals. Additional standards, above these minimums may be established by state and local authorities, clinical specialty organizations, and through the bylaws and policies of individual hospitals. It is reasonable to assume that the policies and procedures that are an essential part of the nursing organization, Department of Case Management and the Medical Staff bylaws at Harlingen Medical Center will address the expected standards of care essential to adhere to patient safety and leadership.

4

120

1) The courts recognize a general duty to care for all patients presenting themselves to a hospital for treatment and care. Not only must hospitals accept and treat each patient entrusted to their care, but they must adhere to the standards of care they have set for themselves, as well as to the national standards (The Joint Commission Hospital Accreditation Standards).

## Patient Safety

The mission of The Joint Commission is to continuously improve health care for the public, in collaboration with other stakeholders, by evaluating health care organizations and inspiring them to excel in providing safe and effective care of the highest quality and value.

2) Maintaining a culture of safety that emphasizes trust, reporting unsafe conditions and effective improvement of patient safety;

The Standards set forth in the Joint Commission Hospital Accreditation Standards pertain.ing to patient safety established a standard of care for all hospitals who are accredited by the Joint Commission, and specifically impacted the care provided to George Andrade.

## 3) Standard PC. 01.03.01

This Standard emphasizes the importance of planning for care, treatment and services on an individualized basis to meet the patient's unique needs. The steps in this process are:

a. Creation of an initial plan for care, treatment, and services that are appropriate to the patient's specific assessed needs such as emergent transfer to include case management nurse and house supervisors such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN.

b. To ensure the hospital continues to meet the patient's unique needs, the plan is maintained and revised based on the patient's response such as continuing attempts to emergently transfer a patient who requires a life-saving surgery.

An additional key Standard pertaining to the Provision of Care, and one directly impacting this case is:

## 4) Standard PC.04.01.01

The hospital has a process that addresses the patient's need for continuing care, treatment and services after discharge or transfer.

Two of the key Elements of Performance are:

• The hospital describes the method for shifting responsibility for a patient's care from one clinician, hospital, program, or service to another.

• The hospital describes the mechanisms for external transfer of the patient.

5) It is reasonable to expect that Case Management nurses and social workers such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN are to collaborate, review medical records, know the diagnosis of the patient they are treating and communicate with hospitalists and attending physicians in carrying out the appropriate plan or care and physician orders.

5

121

6) Further, it is reasonable to expect Case Management nurses and social workers such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN are to follow established transfer guidelines and policies by gaining a patients informed consent, physician to physician communication coordination, providing complete medical records especially in an emergency situation when a patient's safety is at risk.

7) Further, it is reasonable to expect that Case Management nurses and social workers such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN are to attempt to care for the patient which includes following the chain of command when a patient's care needs are not being met placing a patient's safety at risk.

## Breach of the Standard of Care

1) Case management nurses Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN failed to obtain Mr. Andrade's consent for transfer, obtain completed medical charts and physician certifications required for an emergent transfer and delaying an emergency transfer placing Mr. Andrade's safety at risk.

2) Although a plan of care was created for Mr. Andrade, case management nurses Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN failed to ensure that a plan of care was carried out when they failed to follow hospital guidelines for transfer, make every effort to seek other facilities when Mr. Andrade was declined for transfer to ensure his care needs were met placing Mr. Andrade's safety at risk. Emergency transfer attempts do not stop at the end of a day shift when trauma and tertiary centers provide transfer 24 hours a day. Harlingen Medical Center's nurses halted all attempts to carry out a standing order at the end of their shift placing Mr. Andrade's safety at risk.

3) Case management nurses and social workers such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN failed to collaborate, review medical records, have intimate knowledge of the diagnosis of the patient they are treating, and communicate with hospitalists and attending physicians in carrying out the appropriate plan or care and physician orders when they failed to seek further orders and physician involvement to emergently transfer the patient.

4) Case management nurses and social workers such as Maria Torres, RN, Heather S. RN and Debbie Mendoza, RN failed to attempt to care for the patient which includes following the chain of command when a patient's care needs are not being met placing a patient's safety at risk by contacting the Chief of Medical Staff, Chief of Cardiothoracic Surgery and the Medical Center's CEO when it became evident Memorial Hermann was demanding several thousand dollars to accept Mr. Andrade for treatment, and physicians such as Dr. Desai were negligently failing to answer calls from Methodist Hospital.

It is extremely unfortunate that Harlingen Medical Center's efforts to affect a transfer of George Andrade to another facility were incredibly haphazard in nature, fraught with confusion as to who within the organization was responsible to facilitate this transfer and did not forcefully address the clear absence of physician to physician communication.

Based upon my preliminary review of the documents that have been provided by Harlingen

6

122

Medical Center, the 2011 JCAHO Hospital Accreditation Standards and the failures listed above, I hold the following opinion to a reasonable degree of administrative probability. The standard of care as applied to Mr. Andrade, who needed emergency care was not being executed and was breached by the employees and staff of this Medical Center.

The above conclusions and opinions are based upon information that is available to me at this time. This report may be updated and/or revised with any additional information that is provided in the future. I reserve the right to amend my opinion.

Yours very truly,

Ralph E. Cross, FACHE

Attachments

7

**Ralph E. Cross, FACHE**
**6414 Brook Lake Drive**
**Dallas, Texas 75248**

**Telephone: (972) 991-8404 (Residence)**
**(972) 612-7273 (Business)**

---

**EDUCATION**

Florida State University　　　　　Tallahassee, FL
**B.S. Business Administration**

George Washington University　　Washington, DC
**MBA (Health Care Administration)**

University of Texas at Dallas　　　Dallas, TX
**MA International Management**

**EXPERIENCE**

1/99 to Present　　Patient-Physician Network Holding Company, L.L.C.
Plano, TX
**Senior Vice President/Chief Operating Officer**

Serve as Senior Vice President/COO of this medical services organization providing services to 652 physicians and their office staffs. Reporting to the President and Board of Managers, primary responsibilities include Board of Managers relations, coordinating day-to-day operations, preparation of annual operating budgets, preparation of the organization's strategic and tactical plans, negotiation of managed care contracts, coordinating ongoing consultation engagement with major integrated healthcare delivery system, coordinating the Credentialing Department and Credentialing Committee, and physician relations.

1/95 to 1/99　　Sweetwater Health Enterprises　　　Dallas, TX
**Practice Leader**

Served as Professional Services Practice Leader for this quality management, credentialing and managed care consulting organization. Served as lead consultant for twelve major engagements focusing on development and implementation of strategic business plans for integrated healthcare delivery systems, 501(a) physician groups, and medical group practices.

Developed two HMOs for integrated delivery systems. Responsible for coordinating and directing the physician and hospital management practices.

8/91 to 12/94     Integrated Health Care Resources Intl.     Dallas, TX
**Senior Vice President**     Philadelphia, PA

Responsible for operating hospitals under management contracts, developing IPAs and PHOs at managed hospitals, negotiating managed care agreements, physician recruiting and practice management, directing all consulting engagements, and serving as CEO of a 225 bed acute care hospital and its subsidiary corporations.

11/90 to 7/91     Innovative Healthcare Systems     Dallas, TX
**Regional Director**

Served as Regional Director for a six unit outpatient mental health care system.

11/87 to 11/90     Fischer Mangold     Dallas, TX
**Senior Vice President**     Pleasanton, CA

Responsible for developing contracts with hospitals for physician staffing of emergency departments, proposal preparation and presentation, contract management, consultation engagements, physician recruiting, credentialing and interim management of ambulatory care clinics.

11/86 to 10/87     Maxicare North Texas                    Irving, TX
                   **Executive Director**

                   Responsible for the overall operation of a 70,000
                   member HMO which included a provider network of
                   1,200 physicians at 21 locations, 38 dental providers,
                   and 33 hospitals for provision of inpatient and
                   outpatient care.

2/85 to 11/86      Fort Hamilton-Hughes Memorial Hospital and
                   Healthcare Corporation          Hamilton, OH
                   **President and CEO**

                   Responsible to the Board of Trustees of this 354 bed
                   full service community hospital and corporation.
                   Combined annual operating budget of $48 million.

8/80 to 2/85       Methodist Hospitals of Dallas        Dallas, TX
                   (Five Hospital System)
                   **Vice President-Operations**

                   Responsible for internal operations of the system
                   through the administrator in each facility. Additional
                   responsibilities extended to five subsidiary
                   corporations and medical staff liaison.

4/75 to 8/80       Baylor University Medical Center     Dallas, TX
                   **Associate Director and Vice President**

                   Responsible for management and operation of the
                   following divisions: Emergency, Cardiology, Heart
                   Center, Pharmaceutical Services, Material Services,
                   Pharmacy Services, and Medical Records.

11/71 to 4/75      Baptist Medical Center - Montclair     Birmingham, AL
                   **Vice President**

                   Departmental operational and medical staff responsi-
                   bilities for this 485 bed acute care hospital and
                   various subsidiary corporations.

10/69 to 10/71    Medical Service Corps, United States Army
**Captain**

Executive Officer, 326 Medical Battalion, 101st
Airborne Division - Republic of Viet Nam

Commander, Enlisted Company, Walter Reed General
Hospital, and Personnel Officer, Walter Reed Army
Medical Center, Washington, DC

## AWARDS

| | |
|---|---|
| Legion of Merit | Vietnam Service Medal |
| Bronze Star Medal | Vietnam Cross of Gallantry |
| Meritorious Service Medal | Vietnam Civic Actions Medal |
| Army Commendation Medal | Order of Military Medical |
| (Five Oak Leaf Clusters) | Merit |

## ARMY RESERVE

807th Medical Brigade - Seagoville, TX
Rank: Colonel
Final Assignment - Retired April, 1996

## PROFESSIONAL AFFILIATIONS

American College of Healthcare Executives - Fellow
American Medical Association - Vice Chairman, Commission on
Emergency Medical Services 1982-1988

## PUBLICATIONS

Editor of the text <u>Working Effectively With Managed Care Plans -
Strategies for Success,</u> and co-editor of the text <u>The Hospital's Role in
Emergency Medical Services Systems</u>. Author of twenty articles in
professional healthcare journals.

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 4

## TO APPELLANT'S BRIEF

# C. Warren Adams, MD, FACS, FACCP, PLLC

15 May 2014

**VIA FAX 210.228.0887, Email and FEDEX**

Ms. Laura G. Tamez, Esq.
*The Herrera Law Firm*
Riverview Towers
111 Soledad Street
Suite 1900
San Antonio, Texas 78205

RE: <u>Andrade George</u>

Dear Ms. Tamez:

At your request I have completed my review of the medical records kindly supplied by your office and provide this medical expert opinion with regard to the care provided to the deceased, Mr. George L. Andrade by various physicians and the Hospital. I am qualified by my education, training, and 34 years of cardiovascular medicine and surgical experience to opine on the standard of care and causation in this case. I have attached a copy of my current curriculum vitae for your review outlining my education, training, and experience. I graduated from the University of Texas with a Bachelors of Science and Masters in medical microbiology in 1976, and completed and received my Medical Degree from the University Of Texas Health Science Center in 1981. I completed a five-year general surgical residency, one year of trauma surgery, and two years of cardiovascular and thoracic surgical residency while simultaneously completing a surgical critical care residency. I served 17 years in the United ·States Army with worldwide deployments and I am currently in the United States Army Individual Ready Reserve stationed with the 349th Combat Support Hospital/Forward Airborne Surgical Team (CSH-FAST). I am licensed to practice medicine and surgery in the States of Colorado and California, and while on active duty in the United States Army, worldwide. I am board- certified in cardiovascular, thoracic surgery, board-certified in general-trauma surgery, and previously board-certified in surgical critical care. I am a Fellow of the American College of Surgeons, Fellow of the International College of Surgeons, Fellow of the American College of Chest Physicians, a member of the American College of Surgeons Committee on Trauma, and a member of the Society of Thoracic Surgeons. My surgical practice includes treatment of patients with cardiac, great   vessel, peripheral vascular, pulmonary, esophageal, and intra-abdominal pathology.  I am routinely asked to provide surgical critical care consultations to assist other surgeons with postoperative management of complex surgical patients.

I have extensive experience in the treatment of patients with similar comorbidities and primary aortic pathology which was present in the deceased at the time of his treatment at Harlingen Medical Center on December 18, 2011. Additionally, I am a member of the cardiovascular medical executive committee (MEC) at St. Joseph Heart Institute, St. Joseph Hospital in Eureka, California where I maintain full clinical privileges and I am responsible for ensuring quality care and adherence to the ACC/AHASTS (American College of Cardiology/American Heart Association/Society of Thoracic Surgery) guidelines in the treatment of patients with all aspects of cardiovascular disease.

I have reviewed the medical records of George Andrade as follows:

- Harlingen Medical Center, Dates of Admission 12/18-12/22/2011 which included radiology imaging reports of CAT Scans of the chest.

Mr. Andrade was diagnosed with a Type 1 (Stanford A) ascending aortic dissection on December 18, 2011 by CT scan; and subsequent scans while an inpatient as documented in the medical records of the imaging studies read by radiologists.

The opinions expressed in this report are based upon my education, training, and experience in diagnosing, treating, and managing patients with cardiovascular disease, specifically aortic dissection. I am familiar with the standard of care for any similar healthcare provider in Texas and any other similar medical community under the same or similar circumstances, as I have practiced in a community setting, a large medical center, and an army medical center and I am intimately familiar with the diagnosis and treatment of this disease process. However, as is my practice in providing medical opinions with regard to the standard of care, deviations in the standard of care, or causation issues I do reserve the right to change or modify this medical opinion if new or undisclosed information becomes available for my review.

Mr. Andrade was diagnosed with a Type 1 aortic dissection on December 18, 2011 by CT scan. A Type 1 (Stanford Type A) aortic dissection is a tear in the wall of the aorta from above or at the level of the aortic valve, thru the aortic arch and down thru the descending aorta. In his case, this was a cardiovascular surgical emergency because of the high incidence of rupture or pericardial tamponade resulting in immediate mortality. The standard of a care for a Type 1 aortic dissection is emergent surgical repair with a graft to prevent rupture and death. Patients who receive surgical repair within 24-48 hours can result in a better outcome as this dissection can be repaired. Without surgical treatment within 72 hours, rupture of the aorta in a Type 1 dissection can cause immediate bleeding into the pericardium, mediastinum or free rupture into the thoracic cavities.

In preparing this report I have reviewed the complete set of medical records in their entirety concerning the admission of Mr. George Andrade to the Harlingen Medical Center on December 18, 2011 at 3:30 P.M. until his death early on the morning of December 22, 2011. According to the documented medical records, Mr. George Andrade at the time of his death was a 47-year-old male who presented to the emergency department of Harlingen Medical Center at approximately 3:30 P.M. with a history of the acute onset of chest pain with radiation to his neck and lower back. He is triaged at 3:35 P.M. His past medical history was pertinent for the comorbidities of hypertension and obesity for which he was taking Lisinopril, Terazosin, and HCTZ. His vital signs demonstrated systolic and diastolic hypertension, tachycardia and elevated respiratory rate and he was noted to be "distressed". Mr. Andrade was evaluated by emergency room physician Dr. Kolawole Odulaja at 4:54 P.M. who ordered appropriate laboratory studies, a chest x-ray (revealing cardiomegaly), and at 5:30 P.M., he ordered a CT angiogram of the chest and abdomen to rule out aortic dissection. Dr. Odulaja slatted appropriately ACS (acute coronary artery syndrome) protocol and subsequently transferred his care to emergency room physician Dr. Syed Ali, who recommended admission to the hospital at 5:45 P.M. under the hospitalist service, Dr. Nataraj Desai, with the diagnosis of new onset chest pain, atrial fibrillation, dissecting TAA, and possible congestive heart failure. It is documented Dr. Sayed discussed the case with Dr. Desai and Desai accepted the patient at 6:07 P.M. At 6:15 P.M., Dr. Desai telephoned orders of hospital admission management in a guarded condition with bathroom privileges, Lovenox, a consult with Dr. Yardley and a general heart healthy diet. Dr. Desai also ordered a 2D Echocardiogram. Lovenox was administered. At 5:29 P.M., Mr.

Andrade undergoes a CT angiogram of the chest. The radiologist documented a "dissection in the thoracic aorta, definite, and descending thoracic aorta findings highly suspicious for an origin in the descending thoracic aorta, repeat exam may be helpful". At 6:27 P.M., Dr. Ali ordered a consult with Yardley. The ED nurse indicated this order was carried out at 6:38 P.M. At 8:08 P.M., a second CT angiogram now of the abdomen indicated an "aortic dissection most consistent with a Type 1 or Stanford A dissection involving the ascending aorta." At 9:24 P.M., Dr. Ali again ordered a consult with Dr. Yardley. Cardiologist, Dr. David E. Yardley saw the patient at 9:45 P.M. At 10:24 P.M., Dr. Ali documents that Dr. Yardley had discussions with the radiologist to confirm an ascending abdominal aortic dissection. Dr. Ali further documents the case was discussed with Dr. Yardley about the TEE ECHO and it was decided to hold off. It is documented Dr. Desai was also notified of the results. Dr. Yardley recommended admission to the CCU indicating that cardiologist Dr. Shereef Hilmy would assume care the following day. He indicated he discussed the case with Dr. Hilmy that evening. According to Dr. Yardley, Dr. Hilmy, a cardiologist, was to pick up tomorrow to perform an invasive angiography with possible covered graft stenting. Dr. Yardley's progress note time stamped at 10:00 P.M. indicates "keep off anticoagulants for now."

A repeat imaging study (CT angiogram) was performed the following morning, December 19, 2011, based upon a telephone order by Dr. Hilmy at 9:45 A.M. The radiologist documented the image revealed an aortic dissection extending from the root of the aorta through the ascending and descending aorta to the left common iliac artery. Mr. Andrade was administered a dose of Lovenox that morning. A transthoracic echo was ordered by Dr. Desai and performed by Dr. Eduardo D. Flores that same day demonstrating a dilated left atrium and ventricle, with mild left ventricular global hypokinesis and mild aortic root regurgitation. At 11:15 A.M., Desai completed a history and physical with a finding of a descending aortic dissection, back pain, resolving, hypertension, a history of atrial fibrillation and sleep apnea. Dr. Desai felt that a cardiology consultation would be required and cardiovascular surgery it would be able to place an endovascular graft. He ordered stopping Lovenox. Unfortunately, this particular dissection, a Type A dissection is only treated currently with emergent cardiovascular surgical therapy i.e. repairs of aortic root and plication of the dissected aorta with a graft.

At 1:30 P.M. on December 19, 2011, nurse Janice Astom's, RN notes indicate that vascular surgeon, Dr. Ruben Lopez was present to see the patient. Nurse Astom notes the house supervisor is present in the room. According to the house supervisor, Mary Torres, the patient is noted to have been in the shower. Dr. Lopez did not speak with the patient but recommended transfer to Houston. Dr. Hilmy was paged about transfer. He instructed the nurse "to defer to Dr. Desai." Dr. Desai "calls in" an order to transfer to Houston. The primary nurse consulted with the primary doctor and Dr. Hilmy and both agreed to proceed with a transfer to Houston. Upon review of the hospital chart provided, there is no record, on this day, documenting an appropriate consult by Dr. Lopez of this patient, documentation by any physician identifying the reason this patient required a transfer or documentation of communication with the patient as to why he was being transferred. A transfer is not initiated by case management, until 3:15 P.M. There is no documentation of a doctor to doctor call. A physician certification for transfer is signed by Dr. Lopez, but completely blank otherwise. By 3:25 P.M. the hospital case manager documented Mr. Andrade's transfer was rejected for financial reasons. At 4:00 P.M., the floor RN documents that Dr. Lopez said "no one would accept him because he's unfunded." There is no documentation of a further physician order to transfer the patient to another facility on December 19, 2011. At 8:00 P.M, Mr. Andrade complained of pain and had a fever of 101.4. Nurse Croll contacted the physician-on-call for Dr. Desai, a Dr. E. Juarez. Nurse Croll reported the lower back pain, increase in temperature and a potassium level of 3.3. Dr. Juarez ordered Vicodin for pain, blood cultures, urine cultures, a hypokalemic protocol,

and chest xray in the morning, Mr. Andrade received Tylenol and Vicodin for his pain and fever.

At 12:00 A.M. on December 20, 2011, Nurse Croll notes "Cardene drip weaned off." At 2:00 A.M., Nurse Croll documents Mr. Andrade complains of pain, 6/10 to his low back. She administers Vicodin. Nurse Croll noted Lisinopril was held due to low blood pressure. At 4:00 A.M., Mr. Andrade's blood pressure was elevated and his IV was infiltrated. The Cardene drip was restarted at 5:00 A.M. At 7:00 A.M., Dr. Juarez ordered the patient to be weaned off Cardene drip and to use Labetalol as needed for management of hypertension.

Incredibly, a formal "inpatient" cardiology consultation was not obtained until early the morning of December 20, 2011, Dr. Yardley being the last cardiologist to evaluate the patient on the evening of admission. Dr. Hilmy evaluated the patient with his physician's assistant and they recommended transfer to a higher level of care. His diagnosis was ascending aortic dissection and acknowledged he was not a candidate for an endovascular graft. He recommended transfer to a tertiary center that has a higher level of expertise such as Methodist Hospital, Memorial Hermann or Texas Heart Institute. He stated that they are "pending placement". At 9:00 A.M., Dr. Desai now notes that Mr. Andrade has an ascending aortic dissection, type 1 and the patient has a hypertensive state. He indicates Dr. Hilmy has followed this patient as well as Cardiothoracic Surgery. Dr. Desai's plan is to get cardiac recommendations, a cardiothoracic consult, and indicates that the patient might need advanced surgery so recommends a "probable transfer". He planned to obtain Dr. Lopez' recommendation about anticoagulation. He acknowledges the patient's blood pressure has been high. An echocardiogram was ordered. Dr. Desai documents the patient's prognosis is poor. He will wait for recommendations. At 9:30 A.M., Dr. Desai orders a CT surgery consult. At 10:45 A.M. he orders transfer to a higher level of care for emergent CT surgery for ascending aortic dissection. Again, from the medical records it appears that transfer of this critically ill patient to a higher level of care was left to the case management team, who were unsuccessful in transferring this patient urgently to a receiving facility. I do not find in the medical records any documentation that case management coordinated a physician to physician communication or that one was made between the medical staff at Harlingen Medical Center to a major cardiovascular center in the past two days. At 1:00 P.M., the case management's notes reveal their second attempt with Memorial Hermann is not successful as the surgeon at Memorial states "case is urgent and not emergent or else it would have been done yesterday." Clearly, there is a lack of a communication with the accepting hospital about the urgency of this case. There is no documentation a physician called Memorial Hermann Hospital and the certificate of transfer is blank. It is not until 1:25 P.M. on December 20, 2011, that case management, Nurse Torres, contacts a second hospital for transfer of this patient with a known surgical emergency. There was no capacity at UTMB hospital in Galveston. There is no doctor to doctor call documented. At 2:45 P.M., a hospital in San Antonio was contacted. It was their transfer coordinator who requested a physician to physician call and was unable to reach Dr. Desai, the hospitalist, after six attempts. Finally, after a discussion between Dr. Knight, a cardiothoracic surgeon and Dr. Desai, Dr. Knight did not accept the patient. At 4:10 P.M., case management documents the patient is declined due to no accepting physician. Meanwhile, Mr. Andrade's pressure remains elevated. At 4:50 P.M., University Hospital in San Antonio declined the patient. There is no doctor to doctor call documented. After this time, neither Harlingen Medical Center nor their physicians make any more attempts to transfer this critically ill patient on December 20, 2011.

In the early morning hours of December 21, 2011, Mr. Andrade remains hypertensive. At 8:46 A.M., Dr. Hilmy dictates a progress note that Mr. Andrade has an ascending aortic root dissection with severe chest and upper back pain. He has been assessed by the Heart Clinic. He further states the patient

50

is not a candidate for an endovascular invention. He indicates Dr. Ruben Lopez agrees. He asserts that the patient is "being evaluated by different centers and being considered for transfer." His statement is inconsistent with the medical chart provided. He continues to assert that "we are awaiting transfer and arrangements are being made for a center in San Antonio or Houston. Again, at this stage and according to the medical chart provided, there have been no efforts to transfer the patient in the last 15 hours. At 10: 15 A.M., the nursing notes state that Dr. Desai and members of case management staff advised the patient and family of a possible transfer to San Antonio. At 10:30, case management contacted Methodist Hospital in San Antonio again and was reminded the case was processed and declined on December 20[th]. At 10:32 A.M. Dr. Desai's progress notes indicate they are still awaiting transfer as the patient will need advanced care since "his condition appears critical." An echocardiogram is pending. At 1:30 P.M., Harlingen medical center case managers were advised for the fourth time there was no accepting surgeon at Methodist Hospital in San Antonio. At 2:00 P.M., Nurse San Juana indicates Mr. Andrade is resting and waiting for possible transfer to San Antonio. At 4:00 P.M., case management contacts Memorial Hermann, who declines patient, yet again. For the next 14 hours, no further efforts are documented by Harlingen Medical Center or any physician to transfer this patient to another facility for the surgery he needs. Although, at 7:15 P.M. it is noted that the patient and family are advised by case management of the progress of transfer.

Predictably, as a Type A dissection, if not treated urgently or emergently by surgical repair is universally fatal, and of course on the morning of December 22, 2011 Mr. Andrade experienced a free rupture into his pericardium and abruptly arrested and did not survive.

Based upon my review of the medical records and with the knowledge and experience of over 34 years of treating patients with aortic dissection, familiar with what constitutes ordinary care, negligence and proximate cause, I am able to render this medical opinion with regard to the deviations in the standard of care by the following physicians.

Familiarity/Qualifications with the Standard of Care·David Yardley, MD.

I am a board certified cardiovascular and thoracic surgeon, and have practiced in this specialty for over 34 years. I am also an experienced trauma and critical care surgeon. The illness or medical condition involved in Mr. Andrade's claim against the named defendants is consistent with a Type A aortic dissection. As a board certified cardiovascular and thoracic surgeon, I have specific knowledge, training and experience in the diagnosis, care and treatment of the conditions involved in this patient. It is my understanding that Dr. Yardley is a cardiologist and internal medicine doctor, who was providing medical care to Mr. Andrade upon his admission to Harlingen Medical Center. Although I am not a cardiologist or internal medicine physician, I am nonetheless familiar with the standard of care that applies to Dr. Yardley as it relates to the diagnosis, care and treatment of a Type A aortic dissection because a tear of the aortic wall is a medical condition which a cardiologist and an internal medicine physician is expected to recognize and diagnose, and the standard of care described below applies to any physician treating a patient suffering from an aortic dissection. Furthermore, because of my background, training and qualifications as a cardiovascular and thoracic surgeon, I am regularly and routinely consulted by cardiologists and internal medicine physicians. I have practical knowledge of what is usually and customarily done by other practitioners under the circumstances similar to those that confronted Dr. Yardley in December 2011 when he examined Mr. Andrade, and discovered he had an aortic dissection.

Qualifications Regarding the Causal Relationship- Dr. David Yardley

As a board certified cardiovascular and thoracic surgeon, I have been trained and I am qualified to diagnose, care for and treat patients suffering from aortic dissection. I am also a trained trauma and critical care surgeon. As a cardiovascular and thoracic surgeon, I repair aortic dissections, I provide pre- and post-operative care, treatment and orders. I am familiar with the physiological process of an aortic dissection and know that any delay in diagnosis and treatment can lead to aortic rupture and death. I am also familiar with the medical fact that if a patient receives timely and appropriate surgical treatment to include the replacement of the aortic root and/or replacement of the aortic valve for a Type A aortic dissection in a timely manner results in a superior and better outcome since a dissection can be halted and repaired.

Standard of Care

It is my medical opinion that cardiologist, Dr. David E.Yardley grossly departed and breached the accepted standard of care and his departures in the standard of care resulted in the death of Mr. Andrade.

1) Dr. Yardley was required based upon the patient's symptoms, clinical presentation, and imaging studies to:

2) Immediately obtain a cardiothoracic surgical consultation for immediate surgical treatment of a Type A dissection. The clinical history, clinical presentation, and imaging studies demonstrate an emergent surgical issue, the replacement of the aortic root and/or replacement of the aortic valve;

3) to provide the basics of ACLS, that is, provide airway support, assist with oxygenation, and perform or require that central lines be placed for volume resuscitation, beta blockade, and cardiac monitoring;

4) Immediately transfer to a medical center that is capable of performing aortic surgery was required at that point.

Breach and Causal Relationship

Notwithstanding a confirmed Type A aortic dissection, a surgical emergency, on the night of December 18, 2011, Dr. Yardley did not follow the standard of care, when he ordered the patient remain as an inpatient, to be moved to CCU and deferred treatment to Dr. Hilmy the NEXT day for a covered stent graft which is not used for this type of dissection, and when time is of the essence in a patient with this type of dissection. Invasive angiography with covered graft stenting is not the standard of care in a patient with an ascending aortic dissection. The standard of care is open surgical repair with a graft. Dr. Hilmy did not show the next day to render proper treatment and management of this patient.

1) Dr. Yardley failed to obtain an immediate cardiothoracic surgical consultation for immediate surgical treatment of a Type A dissection presented and instead, allowed the patient to remain an inpatient deferring inappropriate treatment, to include a covered stent by Dr. Hilmy the NEXT day when time was of the essence to surgically repair the ascending aortic dissection;

2) He failed to provide the basics of ACLS, that is, provide airway support, assist with oxygenation, and perform or require that central lines be placed for volume resuscitation, beta blockade, and cardiac monitoring;

3) He failed to immediately order transfer of this patient to a medical center that is capable of performing aortic surgery, which was required at that point and allowed the patient to remain overnight to have covered graft stent, which is not the standard of care.

Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.

Dr. Yardley's delay and failure to provide initial and subsequent care of Mr. Andrade resulted in progression of the dissection and the known complication of rupture and death. Time is of the essence and Dr. Yardley failed to provide care for an aortic dissection and failed to follow up or insure that Mr. Andrade was provided care by cardiologist Dr. Shereef Hilmy. Based upon reasonable medical probabilities, had Dr. Yardley provided an immediate cardiovascular surgical consult, medical management of an aortic dissection or transferred Mr. Andrade for emergency surgery in a timely manner, Mr. Andrade, based upon reasonable medical probability, would have more likely than not survived.

I am familiar with the terms "negligence", "ordinary care" and "proximate cause". Based upon my review of these records, and the foregoing analysis, it is my opinion, based on reasonable medical probability, that Dr. Yardley was negligent in his care and treatment of Mr. Andrade and it is further my opinion if Dr. Yardley had not breached the applicable standard of care, Mr. Andrade's condition would not have led to progressive decline and death. It is my further opinion that his negligence in delay of consult, treatment and transfer as outlined above was a proximate cause of a free rupture and death. I reserve the right to amend these opinions based on receipt of any further information or records which I receive.

Familiarity/Qualifications with the Standard of Care- Nataraj Desai, M.D.

I am a board certified cardiovascular and thoracic surgeon and have practiced in this specialty for over 34 years. The illness or medical condition involved in Mr. Andrade's claim against the named defendants is consistent with a Type A aortic dissection. As a board certified cardiovascular and thoracic surgeon, I have specific knowledge, training and experience in the diagnosis, care and treatment of the conditions involved in this claim. It is my understanding that Dr. Desai is a family practice physician hospitalist, who was providing medical care to Mr. Andrade upon his admission to Harlingen Medical Center. Although I am not a family physician or a hospitalist, I am nonetheless familiar with the standard of care that applies to Dr. Desai as it relates to the diagnosis, care and treatment of a Type A aortic dissection because a tear of the aortic wall is a medical condition, which a family physician/hospitalist is expected to recognize and diagnose. The standard of care described below applies to any physician treating a patient suffering from aortic dissection. Furthermore, because of my background, training and qualifications as a cardiovascular and thoracic surgeon, I am regularly and routinely consulted by hospitalists and general practice physicians. I have practical knowledge of what is usually and customarily done by other practitioners under the circumstances similar to those that confronted Dr. Desai

on December 18, 2011 when he accepted Mr. Andrade as a patient, and was notified of an aortic dissection.

Qualifications Regarding the Causal Relationship- Dr. Nataraj Desai, M.D.

As a board certified cardiovascular and thoracic surgeon, I have been trained and am qualified to diagnose, care for and treat patients suffering from aortic dissection. I am also a trained trauma and critical care surgeon. As a cardiovascular and thoracic surgeon, I repair aortic dissections, I provide pre- and post-operative care, treatment and orders. I am familiar with the physiological process of an aortic dissection and know that any delay in diagnosis and treatment can lead to aortic rupture and death. I am also familiar with the medical fact that if a patient receives timely and appropriate surgical treatment to include the replacement of the aortic root and/or replacement of the aortic valve for a Type A aortic dissection in a timely manner results in a superior and better outcome since a dissection can be halted and repaired.

Standard of Care

It is my medical opinion that hospitalist, Dr. Nataraj Desai grossly departed and breached the accepted standard of care and his departures in the standard of care resulted in the death of Mr. Andrade.

Dr. Desai was required and had a duty, based upon the patient's symptoms, clinical presentation, and imaging studies:

1) to determine the proper diagnosis of the aortic dissection to initiate the proper treatment;

2) had a duty to immediately consult cardiovascular surgery the night of December 18, 2011;

3) had a duty to immediately contact a medical center that would accept this patient for immediate surgical treatment and to continue to coordinate and engage in those efforts by doctor to doctor communication throughout Mr. Andrade's admission;

4) had a duty to simultaneously ensure that a cardiologist was actively involved in the medical management of this particular type of aortic dissection, i.e., beta blockade and controlled hypotension.

Breach and Causal Relationship

After accepting Mr. Andrade as a patient, the evening of December 18, 2011, Dr. Desai was notified of the ascending aortic abdominal dissection, which was the second CT Angiogram study taken the night of December 18, 2011. Clearly, on the morning of December 19, 2011 as demonstrated by the repeat CT angiogram, a Type A dissection was present and required immediate surgical treatment. Time was of the essence. Dr. Desai breached the standard of the care in the following manner:

1) He failed to properly determine the diagnosis an ascending aortic dissection when there is a CT angiogram report at 8:00 P.M., December 18, 2011 confirming this and a confirmation of the diagnosis the morning of December 19, 2011, which resulted in a treatment of medical management versus the standard of care of an emergent surgical issue. He also breached the

standard of care by ordering Lovenox, an anti-coagulant, which is contraindicated in an aortic dissection patient;

2) He failed to immediately contact cardiovascular surgery the night of December 18, 2011 and the morning of December 19, 2011;

3) He failed to immediately contact a medical center that would accept this patient for immediate surgical treatment and failed to continue to coordinate and engage in those efforts including failing to answer calls from potential tertiary centers after six attempts. Transfer initiatives did not begin until 24 hours after the patient was admitted with a known ascending aortic dissection. Such initiatives were left to house supervisors and case management for 'days without follow up by Dr. Desai;

4) He failed to ensure that a cardiologist was actively involved in the medical management and consult of this particular type of aortic dissection, i.e., beta blockade and controlled hypotension as there was not an "inpatient" cardiology consult until 2 days after admission to the hospital;

5) It is obvious from his clinical note that Dr. Desai was under the clinical impression that this was an isolated descending thoracic dissection and could be medically managed, hence a misdiagnosis, a delay and inappropriate consultation for an endovascular graft from vascular surgeon Dr. Ruben Lopez. This failure resulted in continued dissection of the aortic root and subsequent rupture with the death of Mr. Andrade.

Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.

The delay and failure to provide initial and subsequent care of Mr. Andrade resulted in progression of the dissection to the well-known complication of rupture and death. Time is of the essence and Dr. Desai failed to provide the standard of care for proper consult, transfer, proper diagnosis, and medical treatment of an ascending, aortic dissection and failed to follow up or insure that Mr. Andrade was provided care by a cardiothoracic surgeon at this hospital or at a tertiary center. Based upon reasonable medical probabilities, had Dr. Desai provided an immediate cardiovascular surgical consult, medical management of an aortic dissection or transferred Mr. Andrade for emergency surgery in a timely manner, Mr. Andrade, based upon reasonable medical probability, would have more likely than not survived.

I am familiar with the terms "negligence", "ordinary care" and "proximate cause". Based upon my review of these records, and the foregoing analysis, it is my opinion, based on reasonable medical probability, that Dr. Desai was negligent in his care and treatment of Mr. Andrade and it is further my opinion that if Dr. Desai had not breached the applicable standard of care, Mr. Andrade's condition would not have led to progressive decline and death. It is my further opinion that his negligence in delay of consult, treatment and transfer as outlined above was a proximate cause of a free rupture and death. I reserve the right to amend these opinions based on receipt of any further information or records which I receive.

Familiarity/Qualifications with the Standard of Care- Ruben Lopez, M.D.

I am a board certified cardiovascular and thoracic surgeon and have practiced in this specialty for over 34 years. The illness or medical condition involved in Mr. Andrade's claim against the named defendants is consistent with a Type A aortic dissection. As a board certified cardiovascular and thoracic surgeon, I have specific knowledge, training and experience in the diagnosis, care and treatment of the conditions involved in this claim. It is my understanding that Dr. Lopez is a general surgeon and cardiovascular surgeon who was providing medical care to Mr. Andrade dudng his admission at Harlingen Medical Center. I am familiar with the standard of care that applies to Dr. Lopez as it relates to the diagnosis, care and treatment of a Type A aortic dissection because a tear of the aortic wall is a medical condition which a cardiovascular surgeon is expected to recognize, diagnose, and treat. The standard of care described below applies to any physician treating a patient suffering from an aortic dissection. Furthermore, because of my background, training and qualifications as a cardiovascular and thoracic surgeon, I have practical knowledge of what is usually and customarily done by cardiovascular practitioners under the circumstances similar to those that confronted Dr. Ruben Lopez December 19, 2011, when he provided a consult.

Qualifications Regarding the Causal Relationship- Dr. Ruben Lopez, M.D.

As a board certified cardiovascular and thoracic surgeon, I have been trained and I am qualified to diagnose, care for and treat patients suffering from aortic dissection. As a trained cardiovascular and thoracic surgeon who repairs aortic dissection, I provide pre and post operative care, treatment and orders. I am familiar with the physiological process of an aortic dissection and know that any delay in diagnosis and treatment can lead to aortic rupture and death. I am also familiar with the medical fact that if a patient receives timely and appropriate surgical treatment to include the replacement of the aortic root and for replacement of the aortic valve for a Type A aortic dissection in a timely results in a superior and better outcome since a dissection can be halted and repaired.

Standard of Care

It is my medical opinion that Dr. Ruben Lopez grossly departed and breached the accepted standard of care and his departures in the standard of care resulted in the death of Mr. Andrade.

Dr. Lopez was required and had a duty, based upon the patient's symptoms, clinical presentation, imaging studies and discussion with Dr. Hilmy:

1) to appreciate the urgency of the clinical situation and the urgent if not immediate surgical treatment necessary for an ascending aortic dissection;

2) was required to obtain a consultation from a cardiovascular surgeon or to contact a hospital that was capable of performing emergent aortic root surgery. Dr. Lopez, if not capable of performing an urgent repair of an aortic dissection, had a duty as a consulting surgeon to obtain a surgical consultation and transfer of Mr. Andrade to a higher level of care during Mr. Andrade's admission and until he was transferred;

3) was required to communicate with the patient regarding his diagnosis, prognosis, reason for transfer and treatment options to allow the patient to make informed decisions;

4) was required to complete the certificate of transfer and communicate with other consulting surgeons capable of performing repair of this aortic dissection with a physician to physician call.

Breach and Causal Relationship

Dr. Lopez was called in as a consultant and did not meet with the patient yet recommended transfer of the patient delegating such transfer without written order, communication with the patient, a written consult, or documenting on a certificate of transfer the reason for the transfer. On December 19, 2011, it is documented by Nurse Janice Astom that case management was working on finding an accepting hospital to which Dr. Lopez said, "no one will accept him because he is unfunded." At that point, Dr. Lopez had not dictated a consult or progress notes that would assist potential accepting physicians in recognizing the critical state of Mr. Andrade's rupture.

1) He failed to appreciate the urgency of the clinical situation and the urgent if not immediate surgical treatment necessary for an ascending aortic dissection by failing to perform surgery or to order an emergent transfer;

2) He failed to obtain a consultation from a cardiovascular surgeon or to contact a hospital that was capable of performing emergent aortic root surgery. Dr. Lopez, if not capable of performing a repair of an aortic dissection, had a duty as a consulting surgeon to obtain a surgical consultation and transfer of Mr. Andrade to a higher level of care during Mr. Andrade's admission and until he was transferred. This he failed to do for the next two days;

3) He failed to appropriately communicate with the patient regarding his diagnosis, prognosis, reason for transfer and treatment options to allow the patient to make informed decisions knowing the patient had not been transferred as the records are absent there was any communication by a physician with Mr. Andrade on December 19, 2011 about the necessity, urgency or reason for transfer;

4) He failed to complete the certificate of transfer (he signed it), failed to document a consult or progress note to assist in communicating the critical need for surgery and failed to communicate with other consulting surgeons by a physician to physician call capable of performing repair of this aortic dissection for the next two and half days deferring transfer initiatives of this critically ill patient, who he had knowledge would have difficulty with a transfer, to case management. Unfortunately this was not done resulting in continued dissection of the aortic root and subsequent rupture with the death of Mr. Andrade.

Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.

The delay and failure to provide initial and subsequent care and transfer of Mr. Andrade resulted in progression of the dissection, with the known complication of rupture and death. Time is of the essence and Dr. Lopez failed to provide the standard of care for proper treatment, consult and transfer by a physician to physician call or a documented consult for an ascending aortic dissection and failed to follow

up or insure that Mr. Andrade was provided care by a cardiothoracic surgeon at this hospital or at a tertiary center. Based upon reasonable medical probabilities, had Dr. Lopez provided an immediate cardiothoracic surgical repair, cardiothoracic consult, medical management of an aortic dissection or transferred Mr. Andrade for emergency surgery in a timely manner, Mr. Andrade, based upon reasonable medical probability, would have more likely than not survived.

I am familiar with the terms "negligence", "ordinary care" and "proximate cause". Based upon my review of these records, and the foregoing analysis, it is my opinion, based on reasonable medical probability, that Dr. Lopez was negligent in his care and treatment of Mr. Andrade and it is further my opinion if Dr. Lopez had not breached the applicable standard of care, Mr. Andrade's condition would not have led to progressive decline and death. It is my further opinion that his negligence and failure to transfer as outlined above was a proximate cause of a free rupture and death. I reserve the right to amend these opinions based on receipt of any further information or records which I receive.

Familiarity/Qualifications with the Standard of Care- Shereef Hilmy, M.D.

I am a board certified cardiovascular and thoracic surgeon, and have practiced in this specialty for over 34 years. I am also an experienced trauma and critical care surgeon. The illness or medical condition involved in Mr. Andrade's claim against the named defendants is consistent with a Type A aortic dissection. As a board certified cardiovascular and thoracic surgeon, I have specific knowledge, training and experience in the diagnosis, care and treatment of the conditions involved in this claim. It is my understanding that Dr. Hilmy is a cardiologist and internal medicine doctor, who was providing medical care to Mr, Andrade upon his admission to Harlingen Medical Center. Although I am not a cardiologist or internal medicine physician, I am nonetheless familiar with the standard of care that applies to Dr. Hilmy as it relates to the diagnosis, care and treatment of a Type A aortic dissection because a tear of the aortic wall is a medical condition which a cardiologist and internal medicine physician is expected to recognize and diagnose, and the standard of care described below applies to any physician treating a patient suffering from an aortic dissection. Furthermore, because of my background, training and qualifications as a cardiovascular and thoracic surgeon, I am regularly and routinely consulted by cardiologists and internal medicine physicians. I have practical knowledge of what is usually and customarily done by other practitioners under the circumstances similar to those that confronted Dr. Hilmy on December 18, 2011 when he was agreed to assume care of Mr. Andrade, who had been diagnosed with an ascending aortic dissection.

Qualifications Regarding the Causal Relationship- Dr. Shereef Hilmy

As a board certified cardiovascular and thoracic surgeon, I have been trained and I am qualified to diagnose, care for and treat patients suffering from aortic dissection. I am also a trained trauma and critical care surgeon. I am a cardiovascular and thoracic surgeon, who repairs aortic dissection, I provide pre and post operative care, treatment and orders. I am familiar with the physiological process of an aortic dissection and know that any delay in diagnosis and treatment can lead to aortic rupture and death. I am also familiar with the medical fact that if a patient receives timely and appropriate surgical treatment for a Type A aortic dissection, by first providing medical treatment of hypertension and beta blockade in a timely manner results in a superior and better outcome since a dissection can be halted and repaired.

Standard of Care

It is my medical opinion that cardiologist Dr. Hilmy grossly departed and breached the accepted standard of care and his departures in the standard of care resulted in the death of Mr. Andrade.

1) Dr. Hilmy was required to assume care of the patient on December 19, 2011 as agreed upon on the night of December 18, 2011. That night Mr. Andrade had been diagnosed with an ascending aortic dissection. According to Dr. Yardley, Dr. Hilmy was to assume care of the patient the next morning and based upon the patient's symptoms, clinical presentation, and imaging studies was to do the following:

2) Dr. Hilmy was required immediately to obtain a cardiothoracic surgical consultation for immediate surgical treatment of a Type A dissection. The clinical history, clinical presentation, and imaging studies demonstrate an emergent surgical issue, the replacement of the aortic root and/or replacement of the aortic valve;

3) Dr. Hilmy was required to provide sufficient beta blockade, control of hypertension, and instead provided aspirin, which is contraindicated in patients with acute aortic dissection;

4) Dr. Hilmy was required to immediately seek transfer through a physician to physician communication to a medical center that is capable of performing aortic surgery, which was required at that point.

Breach and Casual Relationship

It is my medical opinion that cardiologist Dr. Shereef Hilmy grossly departed, breached and deviated from the accepted standard of care one would expect from a cardiologist who is to assume care from another cardiologist and treat a patient with an established diagnosis of a Type A aortic dissection. I am quite bewildered that Mr. Andrade was not seen by cardiologist, Dr. Hilmy the following morning of admission, December 19, 2011, but rather December 20, 2011 (two days later) with physician assistant Mr. Ismael Lopez, who both indicated at that point transfer should be considered.

1) Dr. Hilmy failed to assume care of this patient on December 19, 2011 as indicated by Dr. Yardley, and delayed the assumption of this patient, with the exception of a telephone order for a third CT angiogram, until December 20, 2011, when the patient had been admitted on December 18, 2011 and he was notified of the patient's admittance and diagnosis of an emergent surgical issue of an ascending aortic dissection. His failure to assume care caused a further delay in proper medical management as stated in 3) below and delay in surgical treatment, which was the standard of care;

2) He failed to obtain a cardiothoracic surgical consultation for immediate surgical treatment of a Type A dissection. The clinical history, clinical presentation, and imaging studies demonstrate an urgent emergent surgical issue, the replacement of the aortic root and/or replacement of the aortic valve and not a covered stent;

3) He failed to provide a sufficient beta blockade, control of hypertension, and instead provided aspirin, which is contraindicated in patients with acute aortic dissection;

4) He failed to immediately order transfer of this patient on December 18th and 22nd, 2011 to a

59

medical center that is capable of performing amtic surgery, or to find an accepting surgeon which was required at that point. Again, according to the medical records I find no documentation that a physician to physician communication between hospitals occurred to include Dr. Hilmy and simply as referenced in the dictated note by Mr. Lopez "we are pending placement".

Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.

Dr. Hilmy's departures from the accepted standard of care in the treatment of a patient with an acute aortic dissection, delay in diagnosis, treatment and transfer, resulted in the predictable and devastating rupture which occurred on the morning of December 22, 2011, as described in the death note by Dr. Desai and Dr. Hilmy. At that point, without the aforementioned surgical treatment, surgical treatment that should have been performed in a timely manner, Mr. Andrade completed the natural course of the disease process of aortic dissection with rupture and cardiac tamponade. Based upon reasonable medical probabilities, had Dr. Hilmy provided an immediate cardiothoracic surgical consult, medical management of an aortic dissection or transferred Mr. Andrade for emergency surgery in a timely manner, Mr. Andrade, based upon reasonable medical probability, would have more likely than not survived.

I am familiar with the terms "negligence", "ordinary care" and "proximate cause". Based upon my review of these records, arid the foregoing analysis, it is my opinion, based on reasonable medical probability, that Dr. Hilmy was negligent in his care and treatment of Mr. Andrade and it is further my opinion if Dr. Hilmy had not breached the applicable standard of care, Mr. Andrade's condition would not have led to progressive decline and death. It is my further opinion that his negligence in delay of diagnosis, consults, treatment and transfer for three and half days, as outlined above was a proximate cause of a free rupture and death. I reserve the right to amend these opinions based on receipt of any further information or records which I receive.

Familiarity/Qualifications with the Standard of Care- Harlingen Medical Center -Mary Torres, RN, Heather S. RN and Debbie Mendoza, RN, Case Management Staff to include House Supervisors

I am a board certified cardiovascular and thoracic surgeon, and have practiced in this specialty for over 34 years. I admit patients to the hospital for surgery and care for patients who remain in the hospital for pre and post operative care on medical and surgical units as well as intensive care units. I am a practicing trauma and critical care surgeon and in my experience have worked with accepting or receiving patients for transfer. I have worked with case management teams, transfer teams and am familiar with hospital policies; have experience with JCHAO quality assurance programs and standards relating to doctor to doctor communication when transferring a patient in these settings for over 34 years. I am familiar with the standard of care for nurses who are caring for patients such as Mr. Andrade. I also rely on these case management teams to coordinate physician to physician calls and to communicate with me when transfers are declined. The nurses and social workers need to report failed efforts regarding transfer to the patient's physicians and if there is lack of treatment, orders or care for that patient, the nurses have a duty to institute the chain of command by advising a supervisor, chief of staff or hospital administrator.

Qualifications Regarding the Causal Relationship- Harlingen Medical Center -Mary Torres, RN, Heather

S. RN and Debbie Mendoza, RN, Case Management Staff to include House Supervisors

As a board certified cardiovascular and thoracic surgeon, I have been trained and am qualified to diagnose, care for and treat patients suffering from aortic dissection. I am also a trauma and critical care surgeon. I am a trained cardiovascular and thoracic surgeon who repairs aortic dissection, I provide pre and post operative care, treatment and orders. I am familiar with the physiological process of an aortic dissection and know that any delay in diagnosis and treatment can lead to aortic rupture and death. I am also familiar with the medical fact that if a patient receives timely and appropriate surgical treatment to include the replacement of the aortic root and for replacement of the aortic valve for a Type A aortic dissection in a timely results in a superior and better outcome since a dissection can be halted and repaired.

Standard of Care Harlingen Medical Center -Mary Torres, RN, Heather S. RN and Debbie Mendoza, RN, Case Management Staff to include House Supervisors

During Mr. Andrade's admission, on December 19, 2011, his treating physicians ordered transfer to Memorial Hermann Hospital in Houston. Case management, which included hospital administration and case managers and house supervisors, who were registered nurses were delegated the task of transferring Mr. Andrade.

1) Case management to include House Supervisors and nurses, are to require the transferring physician to complete the physician certification for transfer describing the reason for transfer, the diagnosis, the category of urgency of the transfer and what treatment was necessary for the patient and to act immediately when coordinating critically ill patients;

2) Case management is to coordinate or require physician to physician communication for the transfer;

3) Case management is to communicate with the patient's physicians when transfer is declined to seek other facilities;

4) Case management is required to institute the chain of command if the treating physicians are not participating in active efforts to surgically treat or transfer a patient such as Mr. Andrade.

Breach and Causal Relationship

Mary Torres, RN, Heather S. RN and Debbie Mendoza, RN, Case Management Staff to include House Supervisors The case management staff at Harlingen Medical Center had a duty to emergently coordinate transfer of this critically ill patient in conjunction with the patient's physicians.

The Harlingen Medical Center Staff and case management staff at Harlingen Medical Center:

1) Torres, RN failed to obtain the transferring physician's completion of certification or any other documentation describing the reasons for transfer, the diagnosis, the category of urgency of the transfer or what treatment was necessary for the patient;

2) Torres, RN, Heather S. RN, and Mendoza, RN failed to notify the patient's physicians or

attending of the same hospital's repeated decline to seek orders for a different facility;

3) Torres, RN, Heather S. RN, and Mendoza, RN failed to coordinate a physician to physician communication with surgeons at accepting hospitals;

4) Torres, RN, Heather S. RN, and Mendoza, RN failed to contact a supervisor, chief of staff or case manager, about the repeated failures to transfer a critically ill patient or to report the lack of participation by the patient's physicians in effectuating a transfer. For three days the case managers led Mr. Andrade to believe he was pending transfer when he was quickly declined by two facilities and continued to repeatedly call only two other facilities, which had repeatedly declined Mr. Andrade. Case management made no effort to contact any other facilities on Monday, December 19, when he was declined or to seek further orders from physicians on December 20, 2011, when he was declined or on December 21st when repeatedly declined by the same hospitals. Mr. Andrade continued to progressively deteriorate until his death the following day.

Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired.

Harlingen Medical Center and its staff's delay and failure to provide and arrange for providing immediate surgery within the capabilities of the hospital and medical staff, arranging for an emergent and proper transfer of Mr. Andrade to a tertiary center as ordered by physicians as outlined above and in a timely manner resulted in progression of the dissection, with the known complication of rupture and death. Time is of the essence and Harlingen Medical Center and its staff failed to provide the standard of care for proper treatment within its capabilities and emergent transfer by a physician to physician call or a documented consult for an ascending aortic dissection and failed to follow up or insure that Mr. Andrade was provided care by a cardiothoracic surgeon at this hospital or at a tertiary center. Based upon reasonable medical probabilities, had Harlingen Medical Center and its staff arranged for treatment at its hospital or an emergent transfer to a tertiary center in a timely manner, Mr. Andrade, based upon reasonable medical probability, would have more likely than not survived.

I am familiar with the terms "negligence", "ordinary care", and "proximate cause". Based upon my review of these records, and the foregoing analysis, it is my opinion, based on reasonable medical probability, that the administration and case management staff of Harlingen Medical Center were negligent in the care and treatment of Mr. George Andrade and it is further my opinion if the case management staff had not breached the applicable standard of care on December 19th, 20th, 21st and 22nd, Mr. Andrade's condition would not have led to a subsequent ruptured aorta and death. It is my further opinion that their negligence in delay of diagnosis and substandard care as outlined above was a proximate cause of his progressive deterioration, free aortic rupture and death. I reserve the right to amend these opinions based on receipt of any further information or records which I receive.

Therefore, in summary it is my medical opinion that the physicians, Dr. Yardley, Dr. Desai, Dr. Lopez, and Dr. Hilmy and the Harlingen Medical Center Hospital to include Mary Torres, RN, Heather S. RN and Debbie Mendoza RN, grossly departed and deviated from the accepted standards of care one would expect in the treatment of a patient with a Type A aortic dissection. It is my opinion that Mr.

62

Andrade's aortic rupture ultimately occurred due to lack of surgical intervention and available care in a timely manner. It is my opinion Mr. Andrade's dissection was surgically treatable. Dr. Yardley, Dr. Desai, Dr. Lopez, and Dr. Hilmy and the Harlingen Medical Center Hospital to include Mary Torres, RN, Heather S. RN and Debbie Mendoza RN and their breach of the standards of care caused or contributed to the ultimate outcome of the rupture of the aorta and death.

Communication for this type of disease process is physician to physician from sending to receiving hospital and should not ever be left to "case management personnel" as this patient suffered a lethal disease process and time was of the essence to prevent his death. The physicians and the Hospital had a duty to ensure Mr. George Andrade was treated at the standard of care for a Type A aortic dissection and was not allowed to flounder and subsequently expire from a preventable disease process.

I reserve the right to amend or supplement my opinions in the future if new or undisclosed information, additional medical records or additional deposition testimony becomes available for my review. If you have any questions after your review of this medical opinion please do not hesitate to contact me.

Sincerely yours,

Carl W. Adams, M.D., FACS, FACCP
Cardiovascular, Thoracic, and Trauma Surgery
Surgical Critical Care

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 5

## TO APPELLANT'S BRIEF

9200 West Wisconsin Avenue
Milwaukee, WI 53226

June 27, 2014



414-805-6300 phone
414-805-7967 fax

Laura Tamez
111 Soledad Ste 1900
San Antonio, Texas 78205

Re:     Rosa Andrade, et. al. v. Harlingen Medical Center, et. al.

Dear Ms. Tamez:

My name is Daniel DeBehnke MD, MBA. I am a physician licensed by the State of Wisconsin. I am Board Certified by the American Board of Emergency Medicine. My primary professional responsibility is Chief Executive Officer of a Multispecialty Group Practice in Milwaukee, WI and I also continue to practice Emergency Medicine at our regional trauma center. I am founder and medical director of a transfer and access center for a major level 1 trauma center and academic medical center and was Senior Medical Director for Hospital Services for a large level 1 trauma center and academic medical center. I have served on journal review for the Joint Commission Journal on Quality and Safety and presently serve on journal review of the Journal of Healthcare Management. I am also a member of the American College of Health Care Executives. I have served on the Medical College of Wisconsin Patient Care Services Committee and the Service Quality Committee, the Froedtert Hospital Inpatient Services Steering Committee serving as Co-chair, Safety Committee, Joint Legal and Compliance committee, and I am published in the Annals of Emergency Medicine on interhospital transfers.

As an emergency medicine physician, I have extensive experience in the diagnosis, management and treatment of cardiovascular emergencies including aortic dissection, aortic rupture and conditions similar to it. I am presently a professor with the Department of Emergency Medicine at the Medical College of Wisconsin. I have published articles and presented on the topic area of cardiac emergencies. My opinions expressed herein are based on my education, training, and clinical experience as a medical director and emergency physician caring for patients in the same or similar situations as Mr. George Andrade. My attached curriculum vitae lists my full qualifications to render opinions in this case and is attached and incorporated as part of this report.

All of the opinions expressed in this report are based upon my education, knowledge, training, and experience and are also based upon review of the documents presented for review listed below. All of the opinions expressed in this report are based upon reasonable medical probability. I am familiar with the accepted standard of care for the emergent evaluation, management and treatment of conditions like or similar to those experienced by George Andrade, including but not limited to his comorbidities and aortic

**71**

dissection. I am familiar with the accepted standards of care for emergent transfer to include appropriate hospital management and the necessary coordination between case managers and physicians for patients in need of emergent transfer to a higher level of care not available at the current facility. I am also familiar with the complications of a surgically untreated ascending aortic dissection including deterioration of the patient, rupture and death. I am actively practicing health care now and was practicing at the time Mr. Andrade suffered aortic rupture and death.

I routinely am engaged in caring for adults with complex medical and emergent issues in hospital settings. I am knowledgeable about the standards of care that are applicable to physicians, nurses, and hospital administrators who are involved in making decisions regarding hospital capabilities and availability of medical staff. I have dealt with this type of event throughout my own practice. I also routinely interact with nursing case managers and nursing house supervisors in the area of transfer and patient care plan coordination.

At your request, I have reviewed the medical records of George Andrade as follows:

- Hospitalization at Harlingen Medical Center from 12/18/11-12/22/11

At your request, I provide the following opinions relating to the standard of care applicable to nursing case managers, nursing house supervisors and nurses and Harlingen Medical Center.

Review of Facts

Mr. Andrade presented to the Harlingen Medical Center Emergency Department (ED) at 15:32 on 12/18/11 with a chief complaint of chest pain. He had stable vital signs and underwent diagnostic evaluation and was found to have a Type 1 Ascending Aortic Dissection, which requires emergent repair. He was evaluated in the ED by Dr. Yardley and admitted to the ICU under the care of Dr. Desai. According to the orders of Dr. Yardley, Dr. Hilmy is to be the attending cardiologist.

The following day, on 12/19/2011, at 1130, a case management staff member with Harlingen Medical Center, Boravy Maloy, RN met with Mr. Andrade regarding discharge planning. The initial discharge plan for Mr. Andrade was to be discharged home, although there had been a finding of a Type 1 ascending aortic dissection. Mr. Andrade was seen by Dr. Lopez, who was apparently consulted for possible surgical repair. Although there is no documented note by Dr. Lopez regarding his evaluation of Mr. Andrade and his recommendations, the nursing and case management notes state that Dr. Lopez did not actually speak with Mr. Andrade because the patient was in the shower. Dr. Lopez did recommend that he be transferred to another facility for surgical repair. There is not a written or dictated consult by Dr. Lopez. Dr. Hilmy did not show up on 12/19/2011. He did place a telephone order for intravenous fluids and CT scan of the thoracic and abdominal aorta. There is no written consult by Dr. Hilmy. However, through a phone conversation, Dr. Hilmy and Dr. Desai agreed to transfer Mr. Andrade to Houston at approximately 1325. The chart is void of the reason for transfer. The chart is void of whether the patient is stable for discharge. The chart is void of an informed consent for transfer signed by the patient. It is not until 15:15 that a transfer is initiated by Heather S., a house supervisor at Harlingen Medical Center (HMC). There is

2

no documentation of a doctor to doctor call. There is no documentation that a cardiology or cardiovascular surgical consult was provided to the receiving hospital communicating the emergent need for surgery, the type and the reason. The only dictated consult appears to be that of a history and physical dictated by Dr. Desai that shows a descending aortic dissection with a recommended treatment of endoluminal graft. This one consult note would communicate the wrong diagnosis and treatment requested. In addition, the physician certification for transfer is signed by a physician, but is void of documentation regarding the summary of benefits and the summary of risks. Again, the chart does not show the patient was informed of benefits or risk of transfer or risks of not being transferred. The release of medical records signed on that day at 15:30, indicates the type of service needed at Memorial Hermann Hospital was an ICU bed. Within twenty minutes, Heather S., house supervisor with Harlingen Medical Center knew that Mr. Andrade was rejected for financial reasons. She made no attempt to find another facility. Heather S., house supervisor for HMC, does not document communication with any physician about the patient being rejected for transfer or calling the attending to secure an order to a different facility nor does she document an alternative plan for transfer. At 14:00, Nurse Astom documented that Dr. Lopez said "no one would accept him because he's unfunded." Heather S., does not call anyone until 1700 hours. She calls Debbie Mendoza, a registered nurse, with HMC, to inform her that the family is questioning a cash deposit requested by Houston. Heather S., contacts Memorial Hermann Hospital to request a quote at 1800 hours. There is no documentation of communication between Ms. Mendoza RN, Heather S., RN, Mary Torres RN or any other case management personnel to a physician requesting a physician order to transfer the patient to another facility on December 19, 2011. There is one attempt to contact a family member at 1815, who does not answer. Ms. Mendoza, RN, is made aware. There are no further efforts by Harlingen Medical Center's nursing case management staff, house supervisor or any member of hospital administration to carry out the physician's order of a transfer to a hospital in Houston when there is a critically ill patient needing surgical repair of a dissected aorta. There is no documentation the patient was offered an alternative plan or informed of the risk of not being transferred. All efforts appear to have ceased for the night.

Dr. Hilmy, a cardiologist, did not evaluate the patient until December 20, 2011. He recommended transfer to a tertiary center such as Methodist Hospital, Memorial Hermann or Texas Heart Institute. H e further notes they are pending placement. At that time, there are no documented ongoing efforts by any hospital staff to a tertiary center, although there remained an outstanding order. There are no documented efforts to contact the family for approximately fifteen hours. At 10:00, Mary Torres, RN documents that a care plan was discussed with the case manager, Dr. Desai, a primary nurse and Dr. Hilmy, via phone per the director of the 2nd floor. At 10:45. , Dr. Desai again orders transfer to a higher level of care for "emergent CT surgery for ascending aortic dissection". Nurse Torres documents review of Dr. Hilmy's progress note. Notwithstanding the order for "emergent" transfer, Nurse Torres does not document efforts to transfer until 1225. Memorial Hermann hospital, the center which declined Mr. Andrade almost twenty-four hours prior, was contacted again. No other hospitals are contacted. At 1250, Nurse Torres notes she finally spoke to the family about the quote and they could not pay. There is no indication any medical records to include consults or progress notes by Dr. Hilmy or Dr. Desai are provided to Memorial Hermann on this day. There is no documentation there was a doctor to doctor call

3

91

coordinated by Nurse Torres. At 13:00, Memorial Hermann's transfer coordinator returned the call. Nurse Torres documents the following exchange: "Deborah returned call, per her surgeon, case is urgent and not emergent or else it would have been done yesterday" it stands as quoted. Nurse Torres notes that Mr. Andrade's case was denied. Mr. Andrade has been an inpatient nearing 48 hours and there is no documentation of a physician to physician call for emergent transfer to provide him the opportunity for surgical treatment. At 13:25, on December 20, 2011, Nurse Torres, for the first time, contacts a second hospital. There is no documentation a doctor to doctor call was initiated. There is no documentation there was a search to find an accepting physician. By 1400 hours, Nurse Torres was made aware UTMB had no capacity and the transfer was declined. Nurse Torres does not document she communicated with any physician or hospital administrator or supervisor after Mr. Andrade was declined by Memorial Hermann or UTMB Galveston. At 1445, Nurse Torres contacts a Methodist hospital in San Antonio. San Antonio's transfer coordinator requested a physician to physician call. There does not appear to be any medical records forwarded to San Antonio as a HIPPA authorization is not signed until 1453. At 1525, San Antonio's coordinator calls Nurse Torres requesting patient information and a phone number for the attending physician. Clearly, this effort was not coordinated by Nurse Torres upon request at 1445. At 1535, San Antonio's coordinator advises Nurse Torres that Dr. Desai did not answer the call after 6 attempts. Nurse Torres was able to reach Dr. Desai and provided him with San Antonio's phone number for the first documented physician to physician call. By 1600, Nurse Torres was made aware that subsequent to the discussion between Dr. Desai and Dr. Knight, Knight did not accept the patient. By 1610, Nurse Torres was made aware there was no accepting physician at Methodist Hospital. It was the transfer coordinator in San Antonio who connected Nurse Torres to University Hospital. Although Nurse Torres documents information was provided to University, their transfer coordinator called back requesting insurance information. By 1650, Mr. Andrade's transfer was declined because he was out of the county and had no insurance. Again, no physician to physician call was attempted to communicate the need for an emergent transfer. Nurse Torres does not document communicating to any physician or administrator she is unable to carry out the physician's order to emergently transfer a critically ill patient. She documents advising T. Wood, case manager "of the above". Transfer efforts cease at 1650. There are no further attempts by Harlingen Medical Center or its nursing or administrative staff to carry out two physician orders to emergently transfer this patient to a tertiary center to provide him the opportunity for surgery. There is no documentation any attempts are made to contact other cardiothoracic surgeons in the area or statewide to obtain treatment for Mr. Andrade. There is no documentation Mr. Andrade or his family are made aware of the risks involved in Harlingen Medical Center's failed efforts. All efforts cease for the night.

The morning of December 21, 2011, Dr. Hilmy dictates a progress note that Mr. Andrade is "being evaluated by different centers and being considered for transfer" and "we are awaiting transfer and arrangements are being made for a center in San Antonio or Houston." The last efforts made to transfer Mr. Andrade to Houston and San Antonio that are documented, were the day prior at 1300 and 1600 hours, respectively. He had been declined and no other attempt was made to transfer to San Antonio or Houston. At 10:30, Nurse Torres contacts Methodist Hospital in San Antonio, the same hospital which declined Mr. Andrade the day prior due to no accepting physician. There is no indication Nurse Torres coordinated a physician to physician call. San Antonio Methodist stated Mr. Andrade's case was processed

and declined. The transfer coordinator indicated she would attempt to find a surgeon. Nurse Torres did not make any other attempt to transfer Mr. Andrade to another hospital. At 1330, San Antonio Methodist returned the call to state there was no accepting surgeon. At 1600, Nurse Torres contacts Memorial Hermann again and the patient is declined a third time. There is no documentation Nurse Torres communicated her failure to carry out the transfer order with any physician or her supervisor to seek an alternative plan for transfer. At 1645, Nurse Torres notes "will cont. to F/U." There is no documentation thereafter she advocated for her patient to transfer him or to institute the chain of command that her patient was not surgically treated or that she made any further attempt to carry out the transfer orders. There is not a cancellation of the transfer order. At 1915, patient care notes indicate there is a nurse case manager updating the family regarding the progress of transfer. Such progress was nonexistent at that point.

From nursing and case management notes it appears that several hospitals were contacted regarding transfer but either they did not have capacity or required payment in advance because of the patient's lack of 3rd party payer insurance. There is no documentation regarding Mr. Andrade or his family being fully informed of the emergent nature of his condition and the need for immediate surgical repair. Mr. Andrade's vital signs remained stable throughout his hospitalization until he collapsed on 12/22/11 and was not resuscitated.

### Familiarity with Standard of Care for Harlingen Medical Center and HMC's Nursing Case Managers, House Supervisors and Administrative Staff, Maria Torres, RN, Debbie Mendoza, RN and Heather S., RN

I am familiar with the standard of care applicable to the hospital administration and other health care professionals (such as nurse case managers, house supervisors, hospital administrators and primary nurses) working with and who are involved in the process of obtaining consults or transfers for a patient, who encounter an unexpected, incidental or reported finding of medical significance that require further medical management or follow up evaluation, transfer and/or care in patients such as Mr. Andrade. As senior medical director of hospital services for Wisconsin Medical College, I am familiar with the standard of care of hospital administrative policies and procedures relating to hospital capabilities, medical staffing, specialist services to be provided based upon that which is represented to the community and through my experience as founder and medical director of a transfer and access center for a major level 1 trauma center, Medical College of Wisconsin/Froedtert Hospital Access Center. This Access Center is a 24/7 center for patient transfers, physician consultations, patient referrals and for specific physician contact by department. I am involved in the implementation and enforcement of hospital transfer policies, patient flow, decision-making on hospital capabilities, staffing of physicians/consults and communication amongst clinicians and nursing case management to include nurses and administration. As former Chief Officer of Clinical Integration at Medical College of Wisconsin, I was responsible for Wisconsin health system partners to develop a regional integrated health care delivery model to ensure the highest levels of patient care by partnering both the College's clinical and administrative leaders and those of Froedtert Health. As Senior Medical Director of Hospital Services, I participated in administrative decision making and recommended implemented and approved policies and procedures as they related to specialist referrals, physician staffing, hospital capabilities and hospital to hospital transfers to achieve the best level of care

5

93

for patients similar to circumstances faced by Mr. Andrade at Harlingen Medical Center. I routinely work with hospital administrators on committees relating to quality health and safety and inpatient services regarding patient safety, patient rights and;

In my experience as founder and director of a transfer and access center and as senior medical director for hospital services, I routinely work with nurse case managers, house supervisors, primary nurses and hospital administrators, have supervised nursing case managers, house supervisors and primary nurses in that setting, and presently, implement, supervise and enforce procedures to follow under circumstances similar to those encountered by the Harlingen Medical Center case managers and house supervisor. In the normal course of practice I rely on the case management nurses to properly assess, plan, implement, coordinate, interact, monitor and evaluate patients and follow physician transfer orders. I rely on these case management nurses to coordinate physician to physician calls, keep me informed of obstacles and delays in emergency transfers and to provide alternative resources or plans in coordinating the effort. I also rely on these nurses to use clinical judgment to perform their duties in a timely manner when a patient's surgical treatment is dependent upon emergent transfer of that patient. If the case management nurse is delayed by a physician or other facility, the case management nurse is to pursue the chain of command as dictated by the hospital and in each of these contexts, and because of my experience in each, I am familiar with the standard of care applicable to their clinical responsibilities in such conditions through my experience as listed above.

I am familiar with the standard of care relating to hospital operations and services that apply to hospital staffing decisions, I have an experience and knowledge hospital administrative policies and procedures as it they relate to integrating medical professional resources in the community and have experience and knowledge in hospital operations pertaining to inter-facility transfer policies, formulations and implementation of those policies and procedures and standards for patients such as Mr. Andrade, who are diagnosed with an a type 1 aortic dissection.

Therefore, I am familiar with the standard of care for nursing case managers, house supervisors and primary nurses and hospital administrators with regard to the responsibilities, duties and expectations a hospital provides to patients, and for the prevention and treatment of the illness involved in the claim, which is a type 1 aortic dissection.

### Standard of Care Applicable to Harlingen Medical Center's Nursing Case Managers, Nursing House Supervisors and Hospital Administrative Staff, Maria Torres, RN, Heather S., RN, Debbie Mendoza, RN and Terri Wood

The goal of a healthcare team to include physicians and nursing case management is patient flow and safety operations to minimize delays and miscommunications while improving patient safety. Nursing case managers organize and coordinate physician services and services provided by other professionals as relating to patient care within a healthcare system. It is not an 8 to 5 job, especially when dealing with emergency patients such as Mr. George Andrade. Nursing case managers and house supervisors, who are registered nurses have duties relating to patient assessment, planning, implementation of a plan,

6

evaluation and interaction and communication with the patient, patient's family, and physicians when carrying out a patient's healthcare plan based upon physician orders and/or hospital policies and procedures. In the event of a transfer of a critically ill patient such as Mr. Andrade, who has been diagnosed with an ascending aortic dissection needing emergent surgical repair, a nursing case manager and house supervisor's standard of care is to:

- Assist the patient in the safe transfer of care to the most appropriate level as ordered by the physician to include obtaining a completed patient certification from the physician, coordinating a physician to physician call especially when there is no available documented consult; providing all medical records and requiring a physician to physician call so there is no miscommunication about the level of transfer needed; the treatment needed, the consult needed and bed type needed;

- Determine if the patient's transfer is emergent or non-emergent to prioritize transfer needs and communications with other facilities and resources; determining the patient's reason for transfer to advocate for a patient by following the chain of command when a patient's care needs are not being met;

- Identify and facilitate options and services for meeting a patient's healthcare needs by utilizing patient transfer agreements, by seeking other facilities when a receiving hospital declines a patient or by contacting a physician or hospital administrator to request another option for transfer especially when faced with an emergent patient transfer;

- Advocate for patient to facilitate a positive outcome by instituting the chain of command and communicating with physicians and hospital administration when obstacles in patient care or transfer present themselves such as when transfer cannot be made emergently, a physician does not engage in locating an accepting physician or physicians delay in ordering other transfer options to prevent jeopardizing a patient's care;

- Empower the patient to problem solve by exploring care options and alternative plans by obtaining a patient's informed consent of transfer, reason for transfer, keeping the patient informed of delays and instituting problem-solving techniques with attending physicians or hospital administration to overcome delays;

- Educate the patient on treatment payment options at other facilities complete with contact information and community resources along with being honest and candid with the patient about repeated rejections by facilities so timely and informed decisions could be made;

- Facilitate communication and coordination of the patient's emergent transfer until the patient is appropriately transferred- this is a 24/7 approach necessitating paging on-call nursing case managers, house supervisors, risk managers, or other hospital administrators to continue efforts to transfer a critically ill patient.

7

I have been asked to consider the following definitions:

"Negligence," when used with respect to the conduct of HMC and its employees, Maria Torres, RN, Debbie Mendoza, RN, Heather S. and Terri Woods means failure to use ordinary care, that is, failing to do that which a physician of ordinary prudence would have done under the same or similar circumstances or doing that which a physician of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care," when used with respect to the conduct of HMC and its employees, Maria Torres, RN, Debbie Mendoza, RN, Heather S. and Terri Woods means that degree of care that a registered nurse and case manager/house supervisor of ordinary prudence would use under the same or similar circumstances.

"Proximate cause," when used with respect to the conduct of HMC and its employees, Maria Torres, RN, Debbie Mendoza, RN, Heather S. and Terri Woods means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a physician using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than proximate cause of an event.

### Breach of the Standard of Care by Harlingen Medical Center's Nursing Case Managers, Nursing House Supervisors and Hospital Administrative Staff, Maria Torres, RN, Heather S., RN, Debbie Mendoza, RN and Terri Wood

It is my opinion that Harlingen Medical Center and its employees, Nursing Case Managers, Nursing House Supervisors and Hospital Administrative Staff, Maria Torres, RN, Heather S., RN, Debbie Mendoza, RN and Terri Wood breached the standard of care under these circumstances in the following manner:

- Failure to assist the patient in the safe transfer of care to the most appropriate level as ordered by the physician to include obtaining a completed patient certification from the physician, coordinating a physician to physician call especially when there is no available documented consult; providing all medical records and requiring a physician to physician call so there is no miscommunication about the level of transfer needed; the treatment needed, the consult needed and bed type needed. There is no informed consent signed by the patient, a blank physician certification is utilized to find an accepting hospital, one documented physician to physician call is made over three days, clear, lack of communication from HMC to the potential receiving hospitals to include the wrong diagnosis of descending aortic dissection, failure to obtain and provide to accepting hospitals physician consults dictating the patient needs emergent surgery of the aorta. Failure to carry out a physician order is violation of hospital policy and a violation of the standard of care. These numerous failures resulted in a delay of transfer, treatment and ultimate death of Mr. Andrade.

- Failure to determine if the patient's transfer is emergent or non-emergent to prioritize transfer needs and communications with other facilities and resources; determining the patient's reason

8

for transfer to advocate for a patient by following the chain of command when a patient's care needs or transfer are not being met as here where a call is made to Memorial Hospital without a physician to physician call, no proper documentation of the reason for transfer, no informed consent , no financial information, no indication the transfer is emergent and no advocacy on the part of Maria Torres RN, Heather S., RN or Debbie Mendoza RN to contact a hospital administrator, chief officer of nursing, chief of staff, or other administrator to advise there was a critically ill patient who was not receiving the ordered care;

- Failure to identify and facilitate options and services for meeting a patient's healthcare needs by utilizing patient transfer agreements, by seeking other facilities when a receiving hospital declines a patient or by contacting a physician or hospital administrator to request another option for transfer especially when faced with an emergent patient transfer as shown by a failure of HMC's employees to mention a transfer agreement or to seek other facilities in the local area or state of Texas;

- Failure to advocate for Mr. Andrade to facilitate a positive outcome by instituting the chain of command and communicating with physicians and hospital administration when obstacles in patient care or transfer present themselves such as when transfer cannot be made emergently, a physician does not engage in locating an accepting physician or physicians delay in ordering other transfer options to prevent jeopardizing a patient's care such as the case here. Neither Maria Torres, RN, Heather S., RN nor Debbie Mendoza, RN document calling anyone to advise the patient has been declined and needs other options to carry out the care plan and physician orders. When Dr. Hilmy, Dr. Desai or Dr. Lopez would not engage in doctor to doctor calls, supervisors or administration were not contacted to report this. A doctor to doctor call would ensure communication of the emergent need for transfer;

- Failure to empower the patient to problem solve by exploring care options and alternative plans by obtaining a patient's informed consent of transfer, reason for transfer, keeping the patient informed of delays and instituting problem-solving techniques with the patient, attending physicians or hospital administration to overcome delays in a timely manner. While HMC's case managers would advise Mr. Andrade of declines in some instances, alternatives and risk were not discussed with the patient based upon the notes. Dr. Hilmy continued to document that Mr. Andrade was pending placement when there were no efforts by case management to place him at the time and indicating a clear lack of communication between the healthcare team;

- Failure to educate the patient on treatment payment options at other facilities complete with contact information and community resources along with being honest and candid with the patient about repeated rejections by facilities so timely and informed decisions could be made. Neither Nurse Mendoza, Torres nor Heather S., document providing the patient with resources for funding at these other facilities;

- Failure to facilitate communication and coordination of the patient's emergent transfer until the patient is appropriately transferred- this is a 24/7 approach necessitating paging on-call nursing case managers, house supervisors, risk managers, or other hospital administrators to continue efforts to transfer a critically ill patient. Efforts to transfer Mr. Andrade in need of emergent surgery would cease between the hours of 1600-1800 until the next morning at 10:00 in light of hospitals having on-call case managers and transfer coordinators twenty-four hours a day and 7 days a week. One attempt was made to contact a family member in the evening during the first date of transfer attempts. Transfers do not just occur during the day. Emergencies and progression of critical illnesses continue after the day shift leaves. Nurse Torres indicated on December 21st she would continue to follow up. There is no documentation she did. Waiting hours until the next day to resume emergency transfer efforts as the HMC case management staff did for three nights in a row resulted in a delay of transfer and treatment for Mr. Andrade and a disregard for his care.

My opinion is that Maria Torres, RN, Heather S., RN, Debbie Mendoza, RN and Terri Wood failed to protect and advocate for Mr. Andrade by allowing him to remain without any provision for surgical treatment or emergent transfer. The nurses only attempted transfer during the day shift, when access to emergent transfers to receiving tertiary centers are 24/7 for emergencies. The transfer order was never cancelled and not carried out by the HMC nurses in charge of transfer by a physician to physician call, proper communication with receiving hospital regarding the type of transfer and whether it was emergent or non-emergent, no informed consent or communication with the patient, no communication with physicians and no effort to institute the chain of command seeking assistance with the transfer of this patient resulting in his death.

## Standard of Care Applicable to Harlingen Medical Center

Harlingen Medical Center holds itself out to the community as having expertise in cardiac care and cardiothoracic surgery by the following statements taken from their website:

CARDIOVASCULAR CARE SERVICES:

- Operating suites dedicated to heart and vascular surgery
- Cardiac catheterization and electrophysiology laboratories
- Technologically advanced digital equipment
- Advanced patient monitoring systems
- Highly trained and caring clinical staff

VASCULAR SERVICES:

- Peripheral & Arterial Angioplasty
- Thoracic Aneurysm Repair
- Abdominal Aortic Aneurysm Repair

10

OPEN HEART SURGERY:

- Cardiovascular Surgery
- Cardiovascular Valve Surgery
- Minimally-Invasive Coronary Artery Bypass Grafting

A reasonably prudent hospital holding itself to the community as providing those services is required to have the medical and surgical expertise to perform these procedures and care for patients with these conditions.

Dr. Lopez is a cardiovascular surgeon who is on medical staff at Harlingen Medical Center and was consulted in the care of Mr. Andrade. Dr. Lopez is trained as a cardiovascular surgeon and a trauma surgeon. He advertises his expertise on his website as follows:

"His interest is in the surgical treatment of Cardiac and Valvular Heart disease. He has performed over 1500 open heart procedures. He performs both Off Pump (OPCAB) and On Pump Bypass Surgery. He was the first to perform transmyocardial laser revascularization (TMR) in the Rio Grande Valley.

As the Trauma Medical Director he is very active in the acute surgical treatment of all surgical emergencies from Aortic, Cardiac, Thoracic, and Abdominal injuries. He is the first Trauma Fellowship-trained surgeon in the Rio Grande Valley."

A reasonable and prudent hospital that advertises its cardiothoracic surgical services and has on staff a qualified cardiothoracic surgeon is required to provide definitive surgical care to a patient such as Mr. Andrade unless it is deemed beyond the capabilities of the organization and/or the staff. Furthermore, the reasonable and prudent hospital is required through its medical staff agents to provide appropriate and expedient transfer to another facility when unable to perform the services.

The Harlingen Medical Center website provides for the following patient rights:

You have the right to know who is involved in the delivery of your care, and to receive information about your illness, course of treatment, outcomes of care, and prognosis for recovery in terms and language you can understand. The hospital will use alternative communication techniques or aides for those who are deaf or blind, or take other steps necessary to effectively communicate with you.

You have the right to make informed decisions regarding your care and the hospital must respect your wishes.

You have the right to participate, as a partner in the healthcare process, in the development, implementation, and revision of your plan of care, treatment, and discharge plans to meet your psychosocial, psychological, and medical needs.

You have the right to receive, at the time of admission, a copy of the Harlingen Medical Center

Information Guide and be informed of the hospital's methods of educating patients and staff about patient rights and their role in supporting these rights.

You have the right to be transferred to another facility, with a full explanation of the reason for transfer, provision for continuing care, and acceptance by the receiving facility and physician. In case of emergencies, you will be stabilized prior to transfer.

You have the right to leave the hospital against your physician's advice to the extent permitted by law. Once you leave the hospital "Against Medical Advice" (AMA), neither the hospital nor your physician will be responsible for any harm that this action might cause you or others.

You have the right to be free from all forms of abuse, neglect, harassment, and/or have access to protective services.

You (guardian, next of kin or legally responsible person) have the right to make medical care decisions, to formulate an advance directive, to modify your decisions, and to have the hospital staff and practitioners who provide care in the hospital comply with these directives.

You have the right to participate in ethical questions/dilemmas that arise in the course of your care. These include issues of forgoing or withdrawing life-sustaining treatment; withholding resuscitative services, care at the end of life, and/or conflict resolution.

A reasonable and prudent hospital, given a patient such as Mr. Andrade is required to provide him and/or his delegates with information regarding his condition, the urgency of the condition and the risks/benefits of transfer, discharge or lack of definitive care.

I have been asked to consider the following definitions:

"Negligence," when used with respect to the conduct of Harlingen Medical Center, means failure to use ordinary care that is, failing to do that which a hospital of ordinary prudence would have done under the same or similar circumstances or doing that which a physician of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care," when used with respect to the conduct of Harlingen Medical Center means that degree of care that a hospital of ordinary prudence would use under the same or similar circumstances.

"Proximate cause," when used with respect to the conduct of Harlingen Medical Center means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than proximate cause of an event.

### Breach of the Standard of Care of Harlingen Medical Center

It is my opinion that Harlingen Medical Center and its employees and principals breached the

standard of care under these circumstances in the following manner:

- Failure to provide definitive and emergent care, a provision for continuing care such as emergent surgical treatment to Mr. Andrade given the advertised capabilities of the medical center and it's medical staff as evidenced by a lack of documentation regarding the reason for patient transfer;
- Failure to obtain Mr. Andrade's informed consent for transfer, the reason for transfer, the treatment sought and failure to advise Mr. Andrade that although the hospital has capabilities and medical staff who could perform emergency surgery, they are refusing to perform said surgery and the reason. This would allow him to make prompt and informed medical decisions about alternative plans.
- Failure to emergently transfer Mr. Andrade to a medical center, by its employees and agents to a facility that had the capabilities to perform the definitive procedure if the capabilities were not available at Harlingen Medical Center or by enforcing patient transfer agreements with other facilities, if one was available.
- Failure to inform Mr. Andrade and/or his designee of the grave nature of his condition if untreated and provide him with options to obtain this definitive care and to provide continuing surgical care if there were obstacles and delays in transferring care.

### Familiarity with the Causal Relationship and the Causal Relationship

While I may not be a cardiovascular and thoracic surgeon, I am knowledgeable about cardiovascular emergencies to include an ascending aortic dissection and I have been involved in the diagnosis and treatment of the same, even if a patient having that condition has been referred to a cardiothoracic surgeon for more specialized diagnosis and care. In my practice, I have routinely interacted with and consulted with cardiothoracic surgeons as aortic dissection is a medical emergency requiring a consult. I have several published articles and presented on the topic of cardiac and cardiovascular emergencies and I have diagnosed aortic dissections similar to that which was diagnosed in George Andrade. As an emergency and teaching physician, I am familiar with the available diagnostic and treatment modalities for an ascending aortic dissection, and I am familiar with the consequences of not diagnosing or surgical timely treatment of a dissected aorta, in particular one that is progressively worsening.

It is my opinion that the breach in the standard of care as outlined above caused or contributed to cause Mr. Andrade's death from his Type 1 ascending aortic dissection because he was never treated surgically for over 3 days, his aorta ruptured and he died. Mr. Andrade's ultimate aortic rupture and subsequent death would not have occurred had Harlingen Medical Center and its nursing case managers, house supervisors and hospital administration not breached the standard of care by failing to provide surgical treatment by its medical staff within its advertised capabilities of the facility and surgeons on call and failure to implement and complete an two emergent transfer orders to provide the opportunity to surgical treatment at another facility in a timely manner. HMC and its employee's delays adversely affected Mr. Andrade's and was a proximate cause of a downward clinical spiral in his condition to include

13

lack of adequate hospital management resulting in his death.

I reserve the right to amend these opinions based upon receipt of any additional information or records.

Very truly yours,

Dan DeBehnke, MD, MBA
CEO - Medical College Physicians
Sr. Associate Dean for Clinical Affairs
Professor of Emergency Medicine

Cause No. 13-14-00700-CV consolidated with Cause No. 13-15-00119-CV

# APPENDIX 6

## TO APPELLANT'S BRIEF

November 28, 2014

Laura Tamez
The Herrera Law Firm
111 Soledad Street Suite 1900
San Antonio, TX 78205

Re:    Rosa Andrade, et.al v. Harlingen Medical Center, et.al.

Dear Ms. Tamez,

My name is Gerald "Craig" Felty, RN, BSN, MBA, CEN, EMT–P.  I am a registered nurse licensed in the states of Indiana and Illinois. Additionally, I am licensed in the state of Illinois as a registered emergency paramedic. I also hold board certification in emergency nursing from the Emergency Nurses Association and a masters in business administration with a Healthcare focus and baccalaureate and associates' degree in nursing.  My current professional responsibility is as President and CEO of Indiana University Health Starke Hospital in Knox, Indiana. Additionally, I am currently serving as the Interim Chief Nursing Officer at Indiana University Health Laporte Hospital in Laporte, Indiana.  I have been a registered nurse for 20 years and a certified emergency paramedic for 15 years.  My professional nursing career has consisted of emergency nursing and critical care transport.  I also have 18 years of management experience ranging from emergency room management to my current position as President and CEO.  I continue to hold numerous professional certifications related to emergency nursing care and have authored several publications on emergency care and treatment.  Finally, I have been a national speaker on care and treatment of emergency and critical care topics.

As an emergency room nurse, a critical care transport nurse, a patient care manager for an emergency department at a university medical center and former executive director of patient care services in a community hospital, I have extensive experience in the arrangement of acute patient transfers to other facilities with patients having emergency cardiac conditions similar to those of Mr. George Andrade.  I am very well-versed in the emergency medical treatment and active labor act (EMTALA) which governs emergency transfers of patients from one hospital to another. I am also well-versed and familiar with hospital policies and procedures and education and enforcement of those procedures that govern all medically indicated transfers for patients with emergency medical conditions from one hospital to another hospital.   I have collaborated, supervised and coordinated with emergency nurses and house supervisors, case managers and nurse administrators in patient care and transfer services. My opinions expressed in this document are based on my education, training, and clinical experience as a nurse and administrator caring for patients in the same or

359

similar situations as Mr. George Andrade who was in need of transfer from one hospital to another for an advanced level of care.

<u>Review of materials presented to include the patient chart of George Andrade from 12/18/2011 to 12/22/2011:</u>

Mr. Andrade presented to the Harlingen Medical Center Emergency Department on 12/18/2011 with a complaint of chest pain and other symptoms. He was found to have a type 1 ascending aortic dissection that required emergency repair. He was evaluated in the ED by Dr. Yardley and subsequently admitted to the ICU under the care of a hospitalist, Dr. Desai with a cardiology consult by Dr. Hilmy.

The next day (12/19/2011) there was verbal order from Dr. Lopez that recommended he be transferred to another facility for surgical repair of his ascending aortic dissection. Two other physicians involved in Mr. Andrade's care, Dr. Desai and Dr. Hilmy agreed by telephone to transfer Mr. Andrade to Houston. The reason for transfer, whether Mr. Andrade was stable for transfer, whether he had an emergency condition, whether Mr. Andrade consented to the transfer (the chart indicates Dr. Lopez did not speak to Mr. Andrade) or whether the hospital did not have the capability or expert physician to treat Mr. Andrade is not documented in the medical chart. Several hours later, transfer was attempted by nursing supervisor Heather Smith, a house supervisor at Harlingen medical Center. There is no record in the chart of a physician to physician call. Memorial Hermann Hospital chose to reject the patient. Neither Heather Smith nor any other nursing staff communicated this rejection to any of the physicians involved in the care of the patient, any supervisor or nurse administrator or hospital administrator and additionally did not attempt at this time to secure acceptance of the transfer from any other hospitals. There is no record Nurse Smith attempted to contact a supervisor in her chain of command to advise of an inability to obtain transfer of this patient. There is no record Nurse Smith provided a shift change handoff report to the oncoming house supervisor. There is no documentation by Heather Smith, RN or any other nursing staff member attempting to use a transfer agreement from one hospital to another or searching other resources for transfer to other hospitals in Texas or elsewhere as such resources are available to nursing staff involved in transfers.

Cardiologist Dr. Hilmy evaluated the patient on December 20, 2011 and recommended transfer to a tertiary care center for treatment of the ascending aortic dissection. There appeared to have been no efforts since the previous day (12/19/2011) to locate an accepting facility when the patient was initially denied transfer by Memorial Hermann. Dr. Desai then orders transfer to a higher level of care for emergent Cardio-thoracic surgery but this time Nurse Maria Torres' efforts to transfer are not then attempted until nearly 2 hours later. Memorial Hermann medical center was again called and again denied the transfer. There is no documentation of a physician to physician call. There is no documentation Nurse Torres advised any physician or nurse supervisor of her inability to carry out the transfer order. University of Texas Medical Branch at Galveston was then called by Nurse Torres and denied the transfer of the patient due to capacity reasons. This was the first time any other hospital

was called to carry out the order of transfer. There is no documentation Nurse Torres advised any treating physician or nurse supervisor of her inability to carry out this order. Methodist Hospital San Antonio was then called by Nurse Torres and requested a physician to physician call. Nurse Torres did not call any treating physician to coordinate the call. Methodist attempted to contact Dr. Desai six times. He failed to answer. It was not until that time Nurse Torres herself attempted to contact Dr. Desai to coordinate the physician to physician call. There is no documentation Nurse Torres advised any physician or nurse supervisor that Methodist did not accept the transfer. She was connected to University Hospital by the coordinator at Methodist. While there is no record that Nurse Torres coordinated that physician to physician call regarding an emergent transfer, University Hospital was contacted and they also refused to accept the patient for transfer due to the patient being unfunded. At this point in time efforts to secure an accepting facility were stopped. There appears to be no follow-up communication with any physician or any administration personnel regarding the difficulty that Nurse Torres is having with attempting to carry out the order to locate an accepting facility for this emergent transfer. There is no documentation Nurse Torres attempted to follow the chain of command regarding her failure to carry out a physician's order that could endanger the welfare of the patient, there is no documentation Nurse Torres executed a nursing shift change handoff report to the oncoming nurse or house supervisor to allow that person to continue transfer efforts or any documentation by Nurse Torres to pursue any other effort to provide patient care by carrying out the order of emergency transfer.

On December 21, 2011, Dr. Hilmy's progress note shows the patient still waiting on an accepting facility for transfer which is contradicted by the last documented efforts of 4:50 p.m. the day prior. Nurse Torres, after some sixteen hours of delay, contacts Methodist Hospital in San Antonio again and the patient is denied due to there being no surgeon available. Nurse Torres is reminded Mr. Andrade's case was processed the day before and declined. Finally, Memorial Hermann is called for the third time and for the third time declined due to having no insurance. There is no record Nurse Torres contacted any physician, her supervisor, the chief nursing officer or any other hospital administrator to advise she had not carried out the order for emergent transfer. From this point on there are no further attempts by any Harlingen Medical Center staff to locate an accepting facility for the patient's emergency condition. The patient subsequently arrests and dies on December 22, 2011.

Familiarity with Standard of Care for Harlingen Medical Center and its Case Managers, Nursing Supervisors and Nursing staff.

Based on my education, training, and clinical experience, I am familiar with the standard of care that applies to the process of obtaining and carrying out orders for transfer of a patient with an emergency cardiac condition such as Mr. Andrade. As President and CEO and a Nursing Administrator, I am responsible for approving policies and procedures that specify the process and responsibilities held by all nursing personnel when arranging for the transfer of patients like Mr. Andrade and the responsibilities of the transferring hospital and the receiving hospital's transfer

361

coordinators. Additionally, I directly supervise all nursing operations including case management and nursing supervision. I have been paged or contacted at all hours by nurses who are unable to carry out physician orders for one reason or another and need assistance in doing so for the best interest of the patient including finding facilities for patient transfer. Furthermore, having been an emergency room nurse for 20 years, I have personally been involved in the process associated with the transfer of patients like Mr. Andrade on numerous occasions. I therefore consider myself very capable to opine on the actions taken by the nursing case managers, nursing supervisors, and direct care nurses with regards to the responsibilities that are associated with upholding the standard of care for the process of transferring patients who are diagnosed with a type 1 aortic dissection, a surgical emergency.

Standard of Care for Harlingen Medical Center and Its Case Managers, Nursing Supervisors and Nursing Staff: Nurse Maria Torres, RN, Heather Smith RN, Debbie Mendoza, RN, Nurse Terri Wood

In nursing care whether such nurses are supervisors, case managers, emergency nurses or nurse administrators, and specifically when faced with a transfer order of an acute care patient with an emergency condition, nurses are to manage care in a systematic collaborative approach to provide and coordinate healthcare services to their patients. When a patient requires an emergency surgery and there is a pending order or orders requiring transfer, the physician order is not in effect only from the hours of 10 a.m. to 6 p.m. Emergencies do not cease at shift change. House supervisors, case managers and nursing supervisors, including hospital administrators in community hospitals are all available 24 hours and seven days a week. Such nurses have a duty to provide patient assessment, planning, implementation of a plan, evaluation, interaction and communication with the attending physician and the patient.

• The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to follow and to carry out the physician transfer orders for an emergency condition on December 19, 20, 21st and 22nd, 2011 without delay. They are to research and identify all patient resources and facilities by obtaining the hospital's transfer agreements, contacting facilities ordered or finding those facilities capable of providing necessary care and treatment or engaging a transfer service. The physician order for transfer of an emergency medical condition must be carried out as soon as possible and carries over into shift changes of case managers, nursing supervisors and nursing staff and administration.

• The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to obtain and provide appropriate data to the receiving facility if the patient's transfer was an emergency or urgent or neither to properly communicate that to the receiving hospital placing a greater burden on the receiving hospital to accept the transfer. This includes reason for transfer and the proper diagnosis. The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty obtain a certification of patient transfer from a physician that the benefits to the patient from the transfer outweigh the

362

risks of the transfer. This certification should contain the correct diagnosis and whether the patient is stable and whether the patient has an emergency condition. This is critical information that must be communicated promptly and correctly to the receiving hospital to arrange an appropriate transfer. The receiving hospital must know if there is not a physician with expertise is not available, hospital resources are unavailable, higher capabilities of care are not available, a worsening of the patient's condition en route or possible death en route, among other things so that the receiving physician may agree that the transfer is medically indicated and in the patient's best interest. The nurse case managers, supervisors and staff should also obtain why the patient is being transferred, for example, if the transferring hospital has the staff and resources to hand the patient, the receiving hospital does not have to accept the patient. Even if a physician on duty is not available at the time, a "qualified medical person" such as a nurse may complete and sign the certification after consulting with a physician and that physician must countersign the certificate later;

•. The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to arrange a physician to physician call to allow the receiving hospital's physician to communicate with the transferring hospital about diagnosis, treatment, stabilization and the emergency condition and most importantly to avoid miscommunication that could prevent or obstruct an appropriate transfer;

• The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to obtain the patient's informed consent to arrange the "appropriate transfer" so the patient may make informed decisions about the risks and benefits of the transfer, especially when faced with an emergent transfer, and to educate the patient and his family about financial information, resources and available funding at the receiving hospitals;

The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to invoke the chain of command when a physician's order cannot be carried out and the patient's health is placed at risk due to delay or the patient's healthcare needs are not met;

• The nurse case managers named above as well as the nursing supervisors and nursing staff named above had the duty to communicate with the attending physicians regarding the inability to secure a transfer to the hospitals ordered or any other facility that may provide the emergency surgery needed by Mr. Andrade to collaborate on the alternatives for patient treatment and care without delay.

Breach of the Standard of Care for Harlingen Medical Center and Its Case Managers, Nursing Supervisors and Nursing staff.

It is my opinion that the nursing care managers, nursing supervisors, and nursing staff namely Heather Smith RN, Debbie Mendoza, RN, Terri Wood and Maria Torres

363

RN breached the standard of care that was due to Mr. Andrade and the need for transfer for higher care in the following ways:

- Failure to appropriately and within with the standard of care carry out the physician transfer order of an emergency condition on December 19, 20, 21 and 22nd including the failure to obtain a physician to physician call to facilitate transfer, a standard hospital policy for transfer of patients and a failure of locating an accepting facility to transfer Mr. Andrade to by not looking statewide for a facility that may have provided lifesaving care to Mr. Andrade.

- Nurse Smith documents only her attempts to coordinate transfer focused on funding of the patient. Heather Smith, RN contacted one facility on December 19, 2011 without providing or obtaining the appropriate patient data to include the proper diagnosis of an ascending or Type 1 aortic dissection, requiring emergency surgery. There was no consult in the chart indicating the proper diagnosis and there is no record she contacted any physician to obtain one. She did not obtain a physician certification indicating if the patient was stable for transfer, if the patient had an emergency medical condition and why the patient was being transferred. In other words was it due to being unfunded or was it because he need a facility that could provide greater expertise. This data is crucial to the receiving hospital to evaluate if transfer is medically indicated or necessary and if it is in the best interest of the patient. This failure by Nurse Smith to obtain the appropriate data to communicate to the receiving hospital such as a certification or summary led to including the wrong diagnosis included in Dr. Desai's history and physical of descending aortic dissection in the available records. She failed to determine if Mr. Andrade's condition was emergent or non-emergent to facilitate an appropriate transfer. She failed to coordinate a physician to physician call again allowing communication between physicians to provide the patient with the best opportunity for transfer. Nurse Smith also did not communicate with any physician to seek alternative orders, assistance in finding an accepting physician or hospital. Her failures, listed above, are breaches of the standard of care by a nurse supervisor.

The following day, on December 20, 2011, and after a two hour delay, Nurse Torres finds a consult in the chart that indicates an ascending aortic dissection, the correct diagnosis. The communication now indicates an emergent condition. She sends it to Memorial Hospital, the same hospital as the day prior. The receiving physician indicated that Mr. Andrade's case is urgent and not emergent or they would have transferred him "yesterday." The failure by Nurse Smith to communicate an emergent condition on December 19, 2011 is a breached of the standard of care.

Nurse Torres, for the first time on the 20th, contacts another facility. There is no indication she facilitated a physician to physician call to communicate the need for more

is the first documentation of a physician to physician call after the original order for transfer on the 19th. Nurse Torres did not make any other calls to any other facilities and simply waited for Methodist to find a doctor. When declined, Nurse Torres is connected to University Hospital. There is no indicated she facilitated a physician to physician call and the patient was declined within 35 minutes. Nurse Torres's failure to facilitate a physician to physician call for transfer is a breach in the standard of care. She notified Terri Wood, case manager and ceased all efforts to follow the transfer order on that day.

It is not until 10:30 am on December 21, 2011, a sixteen hour delay, that Nurse Torres again attempts to coordinate a transfer to the same hospital that declined Mr. Andrade the day prior. She is reminded that Mr. Andrade's case had already been processed and declined. Within two hours, she was advised Mr. Andrade was again declined. There is no documentation she contacted an attending physician and/or invoked the chain of command to advise that she was unable to emergently transfer this patient in need of a surgery on an emergency basis. After a delay of almost three hours, instead of contacting a different facility, she contacts Memorial Hermann for the third time. Within forty-five minutes, he is again declined. By 4:45 p.m. on December 21, 2011, Nurse Torres no longer documents any efforts of coordinating an emergent transfer for Mr. Andrade to obtain the necessary medical care. This failure to carry out an order after 4:45 p.m. when it has NOT been cancelled, is a breach of the standard of care by Nurse Torres. During the almost fourteen hours prior to his death, neither Nurse Torres or anyone from Harlingen Medical Center documents any attempts to carry out the emergent order for patient transfer depriving Mr. Andrade of surgical treatment.

Failure to work 24/7 to locate an accepting facility to care for Mr. Andrade on December 19, 2011 is also a breach of the standard of care. All attempts were ceased by early evening. Specifically, Nurse Smith failed to provide a shift change report and handoff to the oncoming house supervisor to continue the transfer order efforts. Nurse Smith's failure to carry out the order on the 19th created a delay of transfer on this day and placed her patient's medical condition at risk for deterioration. Nurse Smith's failure to carry out the order of transfer to allow Mr. Andrade to obtain surgery by calling only one facility when there are numerous facilities in Houston, Dallas, San Antonio, Corpus Christi, Galveston, Austin and Fort Worth ensured that his healthcare needs were not being met and is a breach of the standard of care for a nurse supervisor. Neither Nurse Torres nor Nurse Wood continued efforts of transfer through a shift change handoff report, by contacting a physician for an alternative care plan or by contacting any other facility in Texas or the United States on December 20, 2011 knowing Mr. Andrade needed emergency surgery. Such failure by Nurse Torres and Nurse Wood are breaches in the standard of care. By 4:45 p.m. on December 21, 2011, Nurse Torres no longer documents any efforts of coordinating an emergent transfer for Mr. Andrade to obtain the necessary medical care. This failure to carry out an order after 4:45 p.m. on this day when it has NOT been cancelled is a breach of the standard of care by Nurse

365

Torres. During the almost fourteen hours prior to his death, neither Nurse Torres or anyone from Harlingen Medical Center documents any attempts to carry out the emergent order for patient transfer depriving Mr. Andrade of surgical treatment.

- Failure to follow the chain of command and escalate the inability to secure an accepting facility for a surgical emergency to Nursing Administration and even higher.

Once Nurse Smith learned Mr. Andrade had been declined at this one facility, she contacted Debbie Mendoza, RN about Mr. Andrade's family requesting a quote from the hospital. She did not seek assistance from any supervisor, physician or administrator on which facility to contact to attempt transfer. This failure led to a delay in meeting her patient's care needs and is a breach of the standard of care. Once Nurse Torres learned Mr. Andrade had been declined on December 20, 2011, she advised a case manager, but failed to follow up to determine the next step or alternative. She abandoned her efforts to follow the physician order. This failure by Nurse Torres led to a delay in Mr. Andrade medical care needs of emergency surgery of which she was aware and is a breach of the standard of care. Nurse Wood and Nurse Mendoza were also made aware of the failures to follow the physician order and there is no documentation either did anything to carry out the physician order of emergency transfer including contacting a supervisor, nurse administrator, chief nursing officer, chief of staff to advise that a patient needing emergency surgery was not having his medical care needs met. There is no documented action by anyone in the chart. Nurse Torres, Nurse Smith's, Nurse Mendoza's and Nurse Woods' failures to invoke the chain of command when a physician's emergent order could not be carried out is a violation of standard of care. On December 21, 2011, Nurse Torres fails to invoke the chain of command to seek assistance or alternatives in carrying out the emergent physician order. This failure is a breach in the standard of care.

Failure to keep the physician up to date on the inability to secure acceptance for transfer. This occurred on every day of the patients stay

- On December 19, 2011, Nurse Torres handed the transfer order to Nurse Heather Smith, who delayed initiating the transfer pending funding and imaging studies. She failed to immediately initiate the transfer as required in an emergent situation. Nurse Smith documents only the need for funding versus the need for emergency medical treatment. When Mr. Andrade is not accepted, she fails to contact the attending physician to inform him she was unable to transfer the patient. She does not indicate she initiated a shift change or handoff report to the oncoming nurse supervisor. She only attempts once to contact the family about the Memorial Hospital's quote of $67,064.00. When there is no answer by Mr. Andrade's sister, all efforts to transfer him cease. There is no documentation she advised any physician she was going to stop working on the transfer order causing a delay in Mr. Andrade obtaining emergency medical treatment. Nurse Smith's failure to communicate her ceasing to

follow up or to handoff the physician order is a breach of the standard of care. In the early morning of December 20, 2011, Dr. Hilmy notes and is under the impression transfer efforts were ongoing. He states "at this point we are pending placement." There had not been any efforts to transfer Mr. Andrade at this point but to one facility and he had been declined the day prior. On December 20, 2011, Nurse Torres' failure to communicate with a physician of her failure to carry out the physician order to transfer, failure to initiate a shift change report and ceasing her efforts to coordinate a transfer is a breach of the standard of care and led to a delay in Mr. Andrade obtaining medical treatment. On December 21, 2011, Nurse Torres ceases her efforts to carry out a physician emergent transfer order after calling two hospitals, which had already declined the patient. She had eight hours to contact other facilities within Texas and the United States including one documented in progress notes by Dr. Hilmy, Texas Heart Institute. There is no documentation this hospital was ever contacted by Nurse Torres or any other nurse in charge of patient transfer during Mr. Andrade's stay. Nurse Torres's failure to communicate her failure to continue to carry out the emergency physician transfer was a breach in the standard of care.

- Failure to obtain informed consent from the patient by Nurse Maria Torres or Nurse Smith.

Nurse Torres was the first to receive the order for transfer from Dr. Lopez. She documented Dr. Lopez did not speak to the patient because Mr. Andrade was in the shower. She did not indicate she obtained informed consent from the patient and there is no document where Mr. Andrade consented to be transferred. Nurse Torres indicates "both doctors" agreed to proceed with a transfer but there is no indication the patient agreed in writing. Mr. Andrade's medical chart is absent any documentation during the entirety of his stay where he signed an informed consent to be transferred allowing for patient education and allowing for the patient or his family to make informed decisions considering the emergency situation he faced. Nurse Torres fails to obtain Mr. Andrade's informed consent for transfer on December 19, 20, 21and 22, 2011. Such failure is a breach in the standard of care for patient education and in allowing the patient to make informed medical decisions about his medical treatment and needs. If the nurses had complied with the standard of care, in reasonable probability, Andrade would have been placed and would have received the surgery he needed.

367

I reserve the right to amend my opinions based on receipt of any additional case information or patient records.

Sincerely Yours,

Craig Felty/RN, BSN, MBA, CEN, EMP-P